[Civ. No. 8599. First Appellate District, Division One.—September 28, 1932.]

In the Matter of the Estate of THOMAS PATRICK DOYLE, Deceased. M. CHRISTMAN, as Administratrix, etc., Appellant, v. PATRICK DOYLE et al., Respondents.

Rothchild & Golden, I. M. Golden, I. F. Chapman and Joseph A. Pritchard for Appellant.

John Carfraie Birnie for Respondents.

ATTERIDGE, J., *pro tem.*—The present appeal is from the final decree of distribution entered in the estate of one Thomas Patrick Doyle, deceased. In the said decree the trial court found and adjudged that the respondents were either directly or in due course of legal representation first cousins of the deceased, and as such his next of kin and legal heirs. It also further found that appellant's testator, Leonard J. Meehan, was a second cousin of said Thomas Patrick Doyle, but was not his next of kin nor, under our laws of succession, his next immediate legal heir. Leonard Meehan died shortly after the death of Thomas Patrick Doyle, and his estate is represented here through the appealing administratrix with the will annexed of his estate.

Appellant's main contention on the appeal is that the evidence is insufficient to sustain the trial court's finding that respondents were first cousins of Thomas Patrick Doyle, while she is at the same time conceding the correctness of its finding as to the degree of relationship her own testator sustained to the deceased.

Although a resident of San Francisco for a great many years prior to his death on November 3, 1928, Thomas Patrick Doyle appears to have led a secluded and isolated

life. He had never married, and during the period of his residence in San Francisco lived with his mother, Mary Ann Meehan Doyle-Edwards, who predeceased him by about three years. Doyle was about seventy-one years of age at the date of his death, and the great majority of the witnesses, giving testimony as to his family pedigree, were persons of greatly advanced years, whose opportunities of acquiring accurate information concerning and memory of the subject matter of their testimony varied widely. As a consequence thereof, the trial court was required to, and we must assume that it did, weigh and balance the testimony of these witnesses in the light of its own inherent strength or infirmities and with due consideration of their bias in favor or prejudices against the interests of the respective claimants to Doyle's estate. ■ Its finding as to the ultimate fact of heirship comes to us fortified by those favorable presumptions in which an appellate court must invariably indulge in favor of the integrity and correctness of the lower court's determination of all matters of fact, and which in fine require that: "If there is any evidence in the record, or any reasonable inference to be drawn from such evidence, to sustain the findings of the trial court they cannot be disturbed here." (*Kienlen* v. *Holt*, 106 Cal. App. 135–140 [288 Pac. 866].) This fundamental rule of appellate practice applies with equal force to determinations of heirship. (*Estate of Walden*, 166 Cal. 446 [137 Pac. 35].)

■ From our review of the record we find that there was evidence before the trial court from which it could and did infer the following matters and circumstances entering into its final determination of ultimate fact:

Thomas Patrick Doyle was the only child of Patrick *Henry* Doyle and Mary Ann Doyle-Edwards, *née* Mary Ann Meehan. He was born in New York July 12, 1857. Respondents offered evidence tending to prove that they are the children of the deceased sisters and brother of the father of Thomas Patrick Doyle, and therefore the first cousins of the latter. It will be noted that their claim of heirship is upon the paternal side of Thomas Patrick Doyle's ancestry. Appellant on the other hand traces her testator's heirship on the maternal side of said Doyle's ancestry in that he was the grandson of Patrick Meehan, who was the brother of Mary Ann Meehan Doyle, mother of Thomas Patrick Doyle. He was therefore a second cousin of the instant decedent

and one degree further removed from him in kinship than are the respondents.

The evidence tending to establish the relationships described in the preceding paragraph came from sources of approximately equal dignity, and as such was entitled to equal consideration at the hands of the trial court, whose exclusive duty it was to reconcile any and all conflicts and discrepancies that might exist therein. It is, however, the claim and theory of appellant, strenuously urged at the trial and on this appeal, that Patrick Henry Doyle, the father of Thomas Patrick Doyle, was an only child and consequently as such would not have had any brothers and sisters through whom respondents could establish or maintain their asserted relationship to the deceased. This claim and theory, however, is based almost entirely upon certain alleged declarations, alleged to have been independently made some years prior to their respective deaths, by the said Thomas Patrick Doyle, and his said mother, Mary Doyle-Edwards, which are of the tenor and to the effect that their father and husband, respectively, said Patrick Henry Doyle had been an "only child" and that Thomas Patrick Doyle "had no living relations on his father's side". Opposed to the testimony of the alleged declarations of those deceased persons were the depositions of a number of witnesses residing in Ireland, who definitely testified that Patrick (Henry) Doyle had one brother and three sisters and that the present respondents are the surviving children of his said brother and sisters. It should be noted in passing that Patrick Henry Doyle was concededly born in Ireland, while his wife Mary Ann Meehan (mother of Thomas Patrick Doyle) was born in England, and that both emigrated to America at least as early as 1854, for they intermarried in New York City in that year. The trial court might well believe and conclude that these witnesses in Ireland were in at least as good, if not a superior, position to know the facts of Thomas Patrick Doyle's ancestry on his father's side as were any of the witnesses produced on behalf of appellant. Moreover, these witnesses displayed a knowledge of the facts relating to the matter of birth, family history, marriage to Mary Ann Meehan, emigration to America, subsequent movements in this country, and of the eventual death of the said Patrick (Henry) Doyle, to a degree so sufficiently inti-

mate as to at once insure that the identity of the Patrick Doyle to whom their testimony related was one with the self-same Patrick *Henry* Doyle, who appellant herself concedes and claims was the father of Thomas Patrick Doyle. If the actual facts as to this identity of person were to be found otherwise than in accordance with the testimony of these witnesses (resident in Ireland), the only possible basis for so finding would have to be upon the assumption that they acquired the information of which they thus testified at a time subsequent to Thomas Patrick Doyle's death, and then detailed it in evidence for the base purpose of establishing heirship in favor of strangers to his blood. But the correctness of their narratives with respect to the events and details of which these witnesses testify, their apparent good standing in their respective communities, and their ability to withstand cross-examination were, among other things, potent factors tending to wholly disprove so maleficent an assumption. Irrespective of these considerations, the trial court impliedly found in favor of the probity of these witnesses, and under the familiar elementary rule earlier herein enunciated, we could not, were we so disposed, displace its favorable finding with any adverse views of our own.

Appellant in attacking said finding also stresses upon the circumstances that the witnesses in Ireland invariably referred to the father of Thomas Patrick Doyle as Patrick Doyle, whereas in some of the exhibits and by some of her own witnesses the said parent is usually identified by the more extensive name of Patrick *Henry* Doyle, and she thereby seeks to enforce the implication that the two groups of witnesses could not have been referring to the same individual. This circumstance was by no means of controlling importance upon the question of identity. Many persons are known by one of their given and legal names almost to the exclusion of the other.

A similar claim of misidentity, urged by appellant, arises out of the fact that one of her evidentiary exhibits refers to the maiden name of Thomas Patrick Doyle's paternal grandmother as ''Ann Goss'' whereas the data having its origin in Ireland merely refers to her as ''Bridget Doyle''. Aside from the fact that the exhibit in question merely records the answer of the declarant to an inquiry of a bank employee and was therefore likely to be only as complete or accurate

as was the information or belief possessed by the declarant on the subject, this recital in this exhibit was by no means conclusive. The "Ann Goss" referred to in the American exhibits might well have been known in Ireland as "Bridget Ann Goss" or "Bridget Goss" to the complete ignorance of the American declarant of said fact.

These and all other conflicting circumstances to which appellant directs our attention were purely matters of initial reconciliation and determination by the trial court, and the fact that they did exist does not sufficiently militate against the force of the finding as to warrant our setting it aside on this appeal. We therefore hold that the finding in question finds sufficient support in the evidence.

 Appellant also contends that the trial court committed alleged errors of law in connection with its admission of certain evidence over her objections thereto. We have carefully examined these assignments of error and, while it would appear that the action of the trial court in receiving certain depositions in evidence without affording appellant sufficient opportunity to object thereto in the manner hereinafter indicated, was irregular, it is evident, for the reasons hereinafter stated, that such irregularity does not justify a reversal.

In support of their respective claims, all parties litigant relied in great part upon testimony of foreign or absent witnesses which was presented to the court in the form of depositions. Shortly after the trial was under way, the following proceedings transpired:

"Mr. Birnie: I will introduce the depositions and consider them read, your Honor, if it is pleasing to your Honor.

"Mr. Pritchard: *We would rather have the depositions read,* because we think there is so much objectionable matter in them that I would like to call the Court's attention to *them.*

"The Court: They are not going to be read in open court. I will read them.

"Mr. Pritchard: We want to make the objection that *they* are based on hearsay, and are incompetent, irrelevant and immaterial." (Italics ours.)

Mr. Birnie thereupon offered his depositions and the following took place:

"Mr. Pritchard: If your Honor please, for the purposes of the record, we wish to object to the *depositions* on the ground that *they* are hearsay." (Italics ours.)

At a later point in the record of the progress of the trial is the following passage:

"Mr. Pritchard: Now, if your Honor please, we would like to introduce . . . the depositions which were taken on behalf of our client . . .

"The Court: I thought they were all in.

"Mr. Pritchard: We have not introduced them formally.

"The Court: Didn't you have any depositions at all?

"Mr. Pritchard: We have them but they were not introduced . . . "—whereupon appellant placed in evidence eight depositions *in precisely the same manner as that in which those offered by respondents had been previously received over her objection.*

Doubtless there are occasions when the heavy demands upon the time of a busy trial court render it inexpedient and impracticable to permit on all occasions of the reading *in extenso* of depositions in open forum in all cases where the court is sitting without a jury. Nevertheless, in the absence of express or *implied* agreement thereto by counsel, the reception of depositions by the trial court in the manner above outlined constitutes a departure from the correct procedure and practice governing the reception in evidence of oral or written testimony, which requires and always implies that there shall be a full and fair opportunity afforded for the interposition of any and all grounds of legal objection to evidence of any character before its reception for the consideration of the trier of ultimate fact. An examination of our reports will disclose that in the absence of some agreement to the pursuance of a contrary course, the unvaried practice has been to *read* depositions into the record as evidence, as indeed the only statute on the subject (sec. 2022, Code Civ. Proc.), directly indicates is the proper course to pursue.

In pointing out the pernicious effects upon the minds of jurors likely to have been occasioned through the refusal of a trial court to make timely rulings upon objections to certain questions and answers appearing in depositions *in advance of the reading of the same to a jury,* our Supreme Court said:

"No one familiar with the practice of our law need be informed of the vast amount of irrelevant, immaterial and incompetent matter which finds its way as evidence into such depositions. They are not taken before an officer who may rule out such objectionable matter, and there is no check therefore upon its admission. . . . Moreover . . . it will often happen in the taking of depositions, even upon settled interrogatories, as it occurs in court when a witness is testifying *viva voce,* that the answer to a pertinent question will itself be impertinent."

The quotation is from the *Estate of Martin,* 170 Cal. 657, at page 665 [151 Pac. 138, 141], where in summarizing the effect of the practice as thus condemned, the court further declared:

"The result was that a mass of incompetent matter was thus read, heard and considered by the jury."

Although it is obviously less probable that a trial judge will be unfairly influenced by the presence of illegal evidence before him to the same degree as would a jury under similar circumstances, all contention to that effect can be obviated by ruling at appropriate times upon the admissibility of the evidence.

However, before this court is authorized to review and act upon irregularities as such, it is a required condition precedent that the appellant shall have first proceeded as provided in the Code of Civil Procedure, under subdivision 1 of section 657, and in the manner set forth in section 658 thereof. (See in this connection, *Wagner* v. *Meinzer,* 182 Cal. 608 [189 Pac. 435]; *Gay* v. *Torrance,* 145 Cal. 144 [78 Pac. 540].) Instead of so proceeding, as thus required, appellant has elected to bring to our attention the irregular act complained of *merely* as an asserted *error* of law, but in so doing he must of necessity fall in the establishment of his claim of reversible error for the reasons next herein set forth:

From the previously quoted excerpts of the record it will be observed that appellant's objections were of a most general character, and were directed exclusively to the *depositions,* and that in no instance was objection taken to any given question or answer or to any specified portions of the depositions. The rule in general is that "in order that an objection, even to the competency or relevancy of a depo-

sition, should be effective, it should be specific, and addressed to those parts which are objectionable. A mere general objection to the deposition does not reach the defects, as it may be good in part and bad in part; and the objection should be limited to the part which is objectionable.'' (Jones on Evidence, 3d ed., sec. 676.) To similar effect is the holding of our Supreme Court in *Gassen* v. *Hendrick*, 74 Cal. 444 [16 Pac. 242]. Only the most fragmentary portions of the depositions against which appellant thus leveled her general objection would have been possibly subject to the urged ground of objection had the same been sufficiently specific; and, as was said of a somewhat similar situation: ''If it be conceded that certain portions of it were hearsay and improper, the appellant did not specifically object to any particular parts of his evidence. Its motion to exclude was general, and as the testimony was competent and some portions at least were relevant to the issue, appellants' objection cannot avail.'' (*St. Louis, I. M. & S. R. Co.* v. *Taylor*, 87 Ark. 331 [112 S. W. 745, 747].)

It is therefore held that admission of these depositions in evidence over appellant's general objection did not constitute reversible error.

■ Appellant makes the further claim that certain of respondents' exhibits in the nature of copies of baptismal and other records were so wanting in sufficient authentication as to warrant their exclusion from the evidence. But as part of her own case in chief she placed in evidence exhibits which were exactly similar in the method and degree of their authentication. Irrespective of the principle that evidence of a like kind (when not inherently illegal) is admissible to rebut that offered by the opposite party, the evidence in question cannot be regarded of such sufficient importance that its exclusion would have affected the finding of the court one way or the other, and the admission thereof in evidence, therefore, did not constitute reversible error.

For the reasons hereinbefore stated the judgment and decree is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 28, 1932, and an appli-

cation by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 21, 1932.