[Civ. No. 13575.   First Dist., Div. One.   Apr. 15, 1948.]

Estate of FRANK H. O'DONNELL, an Incompetent Person. DEPARTMENT OF MENTAL HYGIENE, Appellant, v. MAY F. DUNHAM, as Guardian, etc., Respondent.

(1)

Fred N. Howser, Attorney General, Elizabeth Palmer and Miriam E. Wolff, Deputy Attorneys General, for Appellant.

Robert E. Hatch and Theodore Tamba for Respondent.

BRAY, J.—In settling the first account and report of the guardian of the estate, the court allowed the American Research Bureau the sum of $4,000 for services rendered the incompetent in locating him. From this order the Department of Mental Hygiene (hereinafter referred to as the department), as a creditor of the estate, appeals.

Frank O'Donnell, the incompetent, was committed to the Mendocino State Hospital several years ago, as in intemperate, and has been a patient of the hospitals of the department ever since. He had two sisters, or half-sisters, Hazel Ryker and May Dunham. On April 28, 1946, Hazel Ryker died intestate in San Francisco. Upon her death, one Murphy proposed to handle her estate upon the grounds that he was a friend, a surviving partner, and that she had agreed to make a will leaving her estate to him. Murphy averred that he did not know the whereabouts of the half-sister, May Dunham, nor did he have any means of locating her. The American Research Bureau (hereinafter referred to as the bureau), licensed by the state as a private investigator, almost immediately located Mrs. Dunham and procured a written contract from her whereby she agreed to pay it 40 per cent of whatever she might recover from her half-sister's estate.

Mrs. Dunham also "invited" the bureau to locate her brother, Frank O'Donnell. The bureau located him as a patient at a state hospital, and Mrs. Dunham's petition for appointment as guardian of his estate was filed within 11 days of the death of the decedent.

On May 9, 1946, Mrs. Dunham petitioned for letters of guardianship of the estate of O'Donnell and shortly thereafter was appointed his guardian. On May 24, 1946, she was also appointed administratrix of the estate of Hazel Ryker, which consisted of $30,000 in cash, and "a lot of deeds to property." It is stated that Mrs. Ryker traded in real estate, but always had it in someone else's name. Her estate

is still in probate due to disputes over titles. In December, 1946, a partial distribution was had in the Ryker estate, by which Mrs. Dunham, as an heir, received $10,000, and a like sum was distributed to her as guardian. On final distribution Mrs. Dunham and Frank O'Donnell's estate will each receive half of the balance of the Ryker estate, if any.

Mrs. Dunham, as guardian, in due course gave notice to the department of the ability of the estate to pay for the care and medical attention theretofore given and thereafter to be given O'Donnell. The department presented a claim in the sum of $1,960, being at the rate of $40 per month from February 1, 1943, to February 28, 1947.

In her account and report, signed and verified only by her attorney, Mr. Hatch, the guardian asked for reasonable attorney's fees and guardian's fees, and for permission of the court to pay this claim, plus future maintenance at $40 per month, and an allowance of $10 per month to the incompetent personally for incidentals. The report also represented to the court that the services of the bureau were of value to the incompetent and his estate and asked for instructions in regard to paying for such services.

At the first hearing of the account and report, Mr. Hatch (who, incidentally, had been selected by Mrs. Dunham as her attorney at the suggestion of the bureau), testified that Mrs. Dunham had signed a contract with the bureau to pay it 40 per cent of her interest in the Ryker estate, "with the idea that she would ask the Court, she being the guardian of her brother, that the Court make the same allowance with reference to the incompetent." He stated that he had a letter from Mrs. Dunham urging that the court allow the bureau the same fee that she was paying it.

A deputy attorney general appeared on behalf of the department, and objected to the allowance. On her statement of unfamiliarity with the matter, the hearing was continued to a later date. At that hearing, Mr. Hatch was again sworn and testified that Hazel Ryker had died without any apparent relatives, or records as to her family; that the bureau located Mrs. Dunham near Bakersfield; that Mrs. Dunham had no idea where her brother might be, as she had not heard of him for years; that the bureau had located him, and again stated that Mrs. Dunham had signed up with the bureau with the understanding that she would recommend to the court that a 40 per cent fee be paid by the incompetent's estate; that if

it had not been for the bureau's work the incompetent would not have been located and no money would have come into his estate. No claim had been presented to the estate by the bureau, and the attorney general contended, first, that it was necessary that such claim should be filed, and secondly, that such claim should set forth what the bureau had done, "the amount of the work, the validity of the claim, and so forth." Mr. Hatch, the attorney for the guardian, who throughout the proceedings both in the lower court and here, has assumed the laboring oar for the bureau, contended: "It is not a question of how much work was to be performed, but the fact that these people went in on a percentage basis and located these individuals." Then the following took place: "THE COURT: Suppose you just file with this Court—although you are not basing it on a claim, but on contract—on the question as to whether 40% is reasonable— MR. HATCH: I will file a full exemplification." The hearing was then continued for this purpose. An unverified "Supplement to Guardian's First Account and Report," again signed only by the attorney, was filed. This in a general way stated the same matters which Mr. Hatch had given in his testimony. No detail of time spent, work involved, or how the bureau located Mrs. Dunham or O'Donnell was given. The report again recommended the payment of the 40 per cent as being a reasonable contingent fee.

At the next hearing, Mr. Hatch called the attention of the court to his report. No detail of the services rendered by the bureau was given at the hearing. The deputy attorney general again took the position that the bureau should show what activities were done to merit the fee requested. Some discussion followed, not germane to this statement, and then the following occurred: "MRS. PALMER [deputy attorney general]: (Interrupting) There was nothing signed here, your Honor—there was no contract with the incompetent. THE COURT: Well, I know, but the question is—I want to hear some law on it, if you are contending, or trying to contend, that this incompetent should come into this money without paying somebody for the efforts in discovering it. MRS. PALMER: I don't contend that at all. We are merely asking to have the amount set by some—— THE COURT: Do you think 40% is unreasonable? MRS. PALMER: Well, I am rather neutral about the affair. THE COURT: If you are neutral, then you are not objecting, and I will allow it; all right, I will allow it."

The court thereupon made an allowance to the bureau of the sum of $4,000 "for investigation services rendered to and for the said incompetent," authorized the guardian to make the payments to the department and for the incompetent as requested, and allowed guardian's fees in the sum of $200, attorney's fees to Mr. Hatch in the sum of $300, plus the sum of $257.45 costs and moneys advanced by him.

The questions presented by this appeal are, first, can there be an implied contract under which the estate of an incompetent may be held liable for services rendered by a private investigator in locating the incompetent and his estate; second, if so, were the circumstances shown the court here sufficient to raise such a contract; in fixing the fee, did the court have before it sufficient evidence of the services rendered; and was the fee allowed reasonable?

1. *There can be an implied contract.*

Both parties to this appeal agree that Mrs. Dunham had no power to make an express contract binding upon the incompetent or his estate, although the respondent places great emphasis on the fact that Mrs. Dunham signed her personal contract "with the idea that she would ask . . . that the Court make the same allowance with reference to the incompetent." ▮ Where the services of an "heir hunter" actually confer a benefit upon an incompetent, a contract will be implied in law for the payment by the incompetent of the reasonable value of the services rendered. The situation would be similar to that in the *Estate of Doyle,* 126 Cal.App. 646 [14 P.2d 909], where reasonable attorney's fees were allowed an attorney for services rendered an incompetent. There, after adjudication of his incompetency, the incompetent employed an attorney to bring proceedings for his restoration to capacity. After rendering some service, but before the proceedings were instituted, the incompetent died. The attorney presented a claim to the administrator of the estate of the deceased for the services rendered the incompetent. Although holding that by reason of section 40 of the Civil Code, which provides that a person adjudged to be incompetent cannot contract, no express contract was entered into between the incompetent and the attorney, the court nevertheless determined that the estate was liable to the attorney under section 38 of the Civil Code. This section provides: "A person entirely without understanding has no power to make a contract of any kind, but he is liable for the reasonable value of things furnished

to him necessary for his support or the support of his family."
It held that "services rendered by an attorney in an attempt
to restore an incompetent to capacity should be classed as nec-
essaries of life." (P. 647.) It further held it would be "un-
just to deny reasonable compensation to the attorney, who is
instrumental in" attempting to have the person restored to
competency. (P. 648.) It then goes on to state that the
distinction between a true contract and one implied by law
"is aptly illustrated by two cases reported in volume 111,
California Appellate Reports. The first of these—*Nielsen* v.
*Witter*, 111 Cal.App. 742 [296 P. 121], was an action on a
common count for money had and received brought by an
incompetent, through his guardian, to recover $1500 paid by
him to an attorney for legal services. Prior to commence-
ment of the action, a notice of rescission was served upon the
attorney by the guardian. It was held by the court that
plaintiff had no mental capacity when he executed the con-
tracts and that he was not bound by them. On the trial of the
case, plaintiff by his guardian 'offered to do equity, and in-
clude in his account such amount as would compensate de-
fendant attorney for such services as might be deemed bene-
ficial to defendant.'

"The second case, *Estate of Nielsen*, 111 Cal.App. 744 [296
P. 122], involves the same facts, and is an application for
allowance of attorney's fees due for services rendered the
incompetent. On the theory of contract implied in law, the
court made an order fixing the sum of $1250 as the reasonable
value of the attorney's services rendered to the incompetent."
(P. 648.)

"So far as the record in the instant case shows, no express
contract was ever entered into by the appellant and decedent,
and therefore sections 39 and 40 of the Civil Code, which refer
to express contracts, are not applicable. Under the circum-
stances here presented, section 38 of the Civil Code . . .
[quoting] may be invoked, in order to bind the estate of the
incompetent upon a contract implied in law for the payment
of necessaries, because we are inclined to the belief that serv-
ices rendered by an attorney in an attempt to restore an in-
competent to capacity should be classed as necessaries of
life." (P. 647.)

Certainly if services to have a person restored to compe-
tency constitute necessaries of life, services for an impecunious
incompetent in locating him and making it possible for him

to receive an inheritance, are also in the same category. It would be unjust to deny reasonable compensation to the person who is instrumental in so doing.

That the law will raise an implied contract for payment of services rendered an incompetent who receives the benefit of such services, even though no express contract can be made, is well shown in the case of *Dorris* v. *Crowder*, 26 Cal.App.2d 49 [78 P.2d 1039]. There, a defendant was charged with the crime of murder. On his arraignment the defendant, who appeared to be completely without funds, told the court that he did not desire counsel appointed for him, and entered a plea of guilty to murder in the first degree. After the plea, the trial judge appointed attorneys to represent the defendant. The plea of guilty was withdrawn and pleas of not guilty and not guilty by reason of insanity were entered. After a trial, defendant was found to be insane and was confined in an asylum. It was later found that defendant was possessed of an estate of nearly $12,000. A guardian of the estate of the incompetent defendant was appointed. The attorneys then sued the guardian for the reasonable value of the services rendered in the criminal action, and obtained a judgment of $1,500. On appeal, in affirming the judgment, the court stated that the question of whether attorneys appointed by the court to defend an insane person charged with murder could charge him a fee, when, after he had been found insane, it was discovered that he was possessed of an estate, was a novel question and of first impression in California. It then went on (p. 51): "We have been cited to and have found no case in California deciding the first question presented. There is *dicta* on the question in the old case of *Rowe* v. *Yuba County*, 17 Cal. 61, where it is said:

" 'Besides, it is part of the general duty of counsel to render their professional services to persons accused of crime, who are destitute of means, upon the appointment of the Court, when not inconsistent with their obligations to others; and for compensation, they must trust to the possible future ability of the parties.'

"It has been held that while an incompetent person cannot make a valid and enforceable contract with an attorney at law, if he does engage an attorney and the attorney performs services for the incompetent, the attorney may recover the reasonable value of his services from the incompetent's estate." The contention was further made (p. 53): "Defendant urges that since plaintiffs were appointed by the court

to represent defendant their services were entirely voluntary and in performance of their duty to the court and that no implied contract to pay for their services can arise from such situation.'' The court held that ''Under these circumstances the trial judge was fully justified in disregarding defendant's statement that he did not desire an attorney. Defendant was insane and it became the duty of the trial judge to see that his legal rights were properly protected.

''At the time plaintiffs were appointed as attorneys for defendant it was not known that defendant had property and was financially able to employ and pay counsel. It, however, was a fact that defendant was able to employ and pay his counsel. Thus one necessary element was lacking to place the obligation upon the trial judge to appoint counsel and to require that the counsel appointed defend the case without compensation. Defendant was possessed of means. Counsel should not be required to defend, without compensation, a man of means who is charged with a crime.''

Respondent contends that appellant has no right to object to the allowance made by the trial court, because it either consented to the trial court's action or induced the trial court to make the allowance it did. Appellant was not of much assistance to the trial court, for when asked if 40 per cent was unreasonable, the reply was ''I am rather neutral about the affair.'' However, appellant neither consented to nor induced the action of the court. In spite of the language last quoted, appellant at all times was trying to get Mr. Hatch to show why O'Donnell would not have been otherwise discovered, the extent and nature of the services rendered, and strenuously contended that 40 per cent was not a reasonable fee. ■ Moreover, appellant could not consent to an improper allowance from the estate of an incompetent. It was the duty of the court, regardless of the acts of appellant, to inquire into all phases of this question and to require a clear showing of justification before ordering the payment of the incompetent's money.

2. *Evidence not sufficient.*

■ The evidence in the lower court was not sufficient upon which to base a finding of implied contract, value to the incompetent of the services rendered, or the reasonable value of the fee charged. It must be borne in mind that the record shows a most peculiar situation. It is claimed that Mrs. Ryker died without any known relatives. Yet, in less than

11 days the "heir hunter" found her brother and sister (Mr. Hatch stated that he was not sure whether they were full or half siblings), obtained a contract from the sister, and had the sister file petitions for appointment as administratrix of the estate of the deceased and as guardian of the estate of the brother. The evidence fails to disclose when the bureau discovered O'Donnell's whereabouts or that he had an interest in the Ryker estate. The report of the guardian on this subject is peculiar in form. It states: "Said incompetent became an inmate of Mendocino State Hospital, Talmage, California, several years ago, but petitioner, who is his sister, did not learn thereof until shortly before May 9, 1946, when she filed her petition herein to be appointed as guardian." May 9th was the 11th day after Mrs. Ryker's death. It was mighty quick work in locating an unknown person. Then, the attorney for the bureau became the attorney for the administratrix and the guardian. He contends that he is not the attorney for the bureau in this matter (presumably in the matter of the collection of the 40 per cent fee from the incompetent's estate), yet when testifying, under oath, he said: "*We* located this sister, Mrs. Dunham . . ." When asked "Who is 'we,' Mr. Hatch?" he replied "The American Research Bureau." (Emphasis added.) Also both the account and the supplemental account, the latter devoted entirely to the matter of obtaining a 40 per cent fee for the bureau, are drawn up and signed by Mr. Hatch alone.

No evidence was produced before the court to show that the relationship of O'Donnell to the decedent would not have been discovered in the ordinary course of events, other than the bald conclusion of Mr. Hatch, who, to say the least, was representing conflicting interests. He owed a duty to the incompetent, as did the guardian, to conserve the estate, and before requesting the court to authorize the paying out of a large portion of the incompetent's money, to inquire objectively and make a detailed showing, that the services rendered were actually of value to the incompetent. In the ordinary course of events the public administrator would have been appointed administrator of the Ryker estate. There is no showing that he would not have discovered what the bureau discovered in less than 11 days. It is not a sufficient showing for a person representing such conflicting interests to make the statement to the court of the conclusion that the incompetent would not have been discovered otherwise. The facts justifying such conclusion should be presented. The attorney

general demanded that these facts be presented; the hearing was continued for that purpose; and yet no such facts were produced. ■ For the law to raise an implied contract creating liability on the part of an incompetent, there must be a clear showing that the incompetent received value under such contract. The very basis upon which such contract rests is that a benefit is conferred upon the incompetent. No proper showing of such benefit was made here.

■ It may be that the bureau did perform valuable services in this matter, for which it should receive reasonable compensation. But the evidence below, in view of the equivocal position of Mr. Hatch, did not justify such a finding.

■ The same is true of the evidence concerning the reasonable value of the services rendered. Assuming that an implied contract arose, there was no showing upon which the court could determine the extent of the services rendered and their value. Mr. Hatch takes the position, evidently followed by the trial court, that an ''heir hunter'' who discovers a missing heir (and for the purposes of this question we will consider O'Donnell to have been such), is entitled as a matter of law to a 40 per cent contingent fee. In this behalf, he contends that the rule applying to the allowance by a court of attorney's fees should apply, namely, that the trial court, by reason of its experience in such matters, may fix the fees of an attorney without the necessity of expert testimony, and even, where it is familiar with the services rendered, without further testimony concerning them. But he overlooks the fact that in every instance where such rule is invoked, the court either knew of the services because they had been performed before it, or evidence of the *extent and nature* of the services was presented. As said in *Mason* v. *United States Fid. & Guar. Co.,* 60 Cal.App.2d 587, 594 [141 P.2d 475], ''It is well settled that when a judge is informed of the *extent and nature* of legal services, he can determine what is a reasonable fee from his own knowledge and experience without the necessity of other evidence.'' (Emphasis added.) To the same effect, *County of Riverside* v. *Brown,* 30 Cal.App.2d 747 [87 P.2d 60]; *Mitchell* v. *Towne,* 31 Cal.App.2d 259 [87 P.2d 908]; ''services shown by the record,'' *Kirk* v. *Culley,* 202 Cal. 501, 509 [261 P. 994]; ''on evidence of the services rendered,'' *Freese* v. *Pennie,* 110 Cal. 467, 468 [42 P. 978]. In *Spencer* v. *Collins,* 156 Cal. 298, 307 [104 P. 320, 20 Ann.Cas. 49], the court considered the time and labor involved. In

*Estate of Reinhertz,* 82 Cal.App.2d 156 [185 P.2d 858, 186 P.2d 755], in upholding certain allowances made to the executor for services personally performed by him in and about the estate's apartment houses, the court said (p. 160): "In the case of services of a nontechnical nature, such as here involved, the judge may fix the value from a *description of the services performed* bringing to bear his own general knowledge and is not necessarily bound by express evidence of the value of the services performed. [Citing cases.]" (Emphasis added.)

We agree that in "heir hunter" cases the court may follow the rule applying to the fixing of attorney's fees, and therefore the court must be advised of the *extent and nature* of the services rendered before using its own judgment of the reasonable value of those services. Certainly, in this case, the court was not advised of the *extent* of the services claimed to be rendered, nor of the *nature* other than the bald claim that without these services, O'Donnell would not have been found. When the court, from its own knowledge and experience, is fixing the fees, based on evidence of the nature and extent of the services performed, it probably can take into consideration the result achieved and the fact that the fees are contingent. But merely because a certain result is achieved and the fee is contingent, does not justify the lack of evidence of the extent of the services.

We are not holding that a 40 per cent fee may not eventually prove to be a reasonable fee, if it is proved that the incompetent actually benefited by the action of the bureau, and when the details of the time spent and work involved are shown. We are merely holding that the evidence before the court is insufficient upon which to base a finding of benefit to the incompetent, or the reasonable value of the services rendered. The circumstances here are somewhat similar to those in *Estate of Reilly,* 81 Cal.App.2d 564 [184 P.2d 922]. There, after holding that the heir hunter's contract was identical in form and language with the one condemned in *Estate of Butler,* 29 Cal.2d 644 [177 P.2d 16, 171 A.L.R. 343], because providing for legal services, the court, in discussing a contention that the case was distinguishable from the Butler case because of the fact that the appellant was a missing heir, went on to state that the record failed to show that the heir was missing or unknown. It also pointed out that the record failed to show any beneficial service rendered to appellant by the heir hunter.

Respondent contends that the department has no standing on this appeal because there will be sufficient money left in the estate to pay its claim, even if $4,000 is paid to the bureau. This is true as to the claim for $1,960 already accrued. However, the court properly allowed the department $40 per month from March 1, 1947 on, for the care of the incompetent, and the sum of $10 per month from August 1, 1947, for incidentals to the incompetent. After the payment of the sums allowed by the court, including the $4,000 to the bureau, amounting to $6,717.45, there would be left in the estate the sum of $3,282.55. This amount, under the court's present order, and without consideration of further expenses, such as guardian's bond, guardian's and attorney's fees, and payments of life insurance premiums which the account shows are now being paid by the guardian, would last the incompetent, who respondent says has an 11-year life expectancy, about five and a half years. O'Donnell may or may not live that long, and his estate may or may not receive additional property from the Ryker estate. Even the more or less slight uncertainty that there will be enough to care for the incompetent as long as he may live makes the department's interest as a creditor sufficient to give it standing on this appeal.

But the department stands in another and far more important light. O'Donnell has been legally committed to its care. The department is the custodial guardian of the person of O'Donnell. The department in this case is trying to give its ward the protection which should have been given him by his guardian, the attorney for his guardian, and the trial court. No niceties of just who is appealing should deprive the incompetent of his right to the protection of the court. Even if there be left plenty of funds to care properly for O'Donnell, whatever length his life may be, there is a duty, too, on the courts to preserve his estate for those who may succeed to it on his death, whether it be heirs or the state.

All of the facts in the case are not disclosed by the evidence. It may be, when they are brought before the court, it may find that the agreement between Mrs. Dunham and the bureau was one in which, as in *Estate of Butler, supra* (29 Cal. 2d 644, 650) there was ''integrated in the consideration therefor . . . the parties' understanding that [the bureau] would manage what legal proceedings were undertaken'' in the estate of Ryker and the guardianship of O'Donnell. The fact that the bureau's attorney became, at its suggestion, the

attorney in both estates, and his great activity in the lower court and here in behalf of its fee, may be of importance. Apparently, in the Ryker estate, the Dunham agreement was not submitted to the scrutiny of the trial court as permitted under the provisions of section 1020.1 of the Probate Code. While such submission is not necessarily required, the failure so to do, combined with the other circumstances of this case, has some significance. However, when the true facts are known, that failure may have no significance. If the bureau assumed or agreed to assume control of the proceedings, then the entire arrangement, under the ruling in the Butler case, would be contrary to public policy. The court, on the further trial of this matter, should examine all the facts and circumstances to see if that is the situation.

The order appealed from is modified by striking therefrom the order directing the payment of $4,000 to American Research Bureau, and as modified is affirmed, appellant to recover its costs. This order is made without prejudice to the right of the trial court to take further testimony along the lines indicated in this opinion.

Peters, P. J., concurred.

WARD, J.—I dissent.

I cannot agree with the majority opinion insofar as it contemplates further action by the trial court with respect to the right of the American Research Bureau to share in the incompetent's estate. Merely striking the order directing the payment of $4,000 to the American Research Bureau would correctly dispose of the present matter.

With respect to the holding that, ''Where the services of an 'heir hunter' actually confer a benefit upon an incompetent, a contract will be implied in law for the payment by the incompetent of the reasonable value of the services rendered,'' I agree that such is the prevailing law assuming that such services are ''necessary for his support.'' (Civ. Code, § 38.) The cases cited in support of this rule are based upon facts indicating that the services must be for stable necessities and of substantial benefit. In determining the applicability of said rule a showing must be made that the services rendered the incompetent meet these requirements.

Prior to the appearance of the bureau, the incompetent was living under the custodial care and expense of the state. His guardian now pays the state for his care, board and lodging. So far as he is concerned, he receives $10 per month for ''in-

cidentals'' out of the partial distribution of $10,000, which dwindled immediately to $3,282.55 as is stated in the majority opinion. Unlike *Estate of Doyle,* 126 Cal.App. 646 [14 P.2d 909], where a payment was made to an attorney who endeavored to restore one to legal competency, in this case the ''incompetent'' is permitted to remain in a state asylum. The majority opinion does not hold that the $10 per month out of a $10,000 partial distribution is a ''benefit'' or ''necessary for his support.'' (Civ. Code, § 38.)

The incompetent, O'Donnell, has evidently been declared an incompetent based upon a charge of inebriety. Whether inebriety renders a person's mind unsound, either temporarily or permanently, is a question of fact. (14 Cal.Jur., p. 335, § 2.) This fact may be a proper phase of examination by the trial court.

It is suggested in the majority opinion that when all of the facts in the case are brought before the trial court ''it may find that the agreement between Mrs. Dunham and the bureau was one in which, as in *Estate of Butler, supra* (29 Cal.2d 644, 650 [177 P.2d 16, 171 A.L.R. 343]) there was 'integrated in the consideration therefor . . . the parties' understanding that [the bureau] would manage what legal proceedings were undertaken' in the Estate of Ryker and the Guardianship of O'Donnell. . . . If the bureau assumed or agreed to assume control of the proceedings, then the entire arrangement, under the ruling of the Butler case, would be contrary to public policy. The court, on the further trial of this matter, should examine all the facts and circumstances to see if that is the situation.'' The majority opinion fails to consider that the present record reveals an agreement within the prohibition of *Estate of Butler,* 29 Cal.2d 644 [177 P.2d 16, 171 A.L.R. 343].

This is not an appeal in which evidence has been introduced by opposing litigants. There is no record from which conflicting inferences may be drawn. The preponderance of the evidence need not be weighed. *Estate of Butler, supra,* does not hold that the practice of law by an ''heir hunter'' must be proved to a moral certainty and beyond a reasonable doubt. It is sufficient that the practice be such as may be reasonably declared to be ''contrary to public policy.'' (See Bus. & Prof. Code, §§ 6060 et seq.; *Smallberg* v. *State Bar,* 212 Cal. 113 [297 P. 916]; *People* v. *Merchants Protective Corp.,* 189 Cal. 531 [209 P. 363]; 9 Cal.Jur. 10-Yr. Supp. § 8, p. 335;

*State Bar of California* v. *Superior Court,* 207 Cal. 323 [278 P. 432] ; *People* v. *Sipper,* 61 Cal.App.2d Supp. 844 [142 P.2d 960] ; *People* v. *Ring,* 26 Cal.App.2d Supp. 768 [70 P.2d 281] ; *Utz* v. *State Bar,* 21 Cal.2d 100 [130 P.2d 377].) The record here shows with unerring accuracy, or, in other words, without any doubt, that in this case the American Research Bureau was practicing law as that term is used in *Estate of Butler, supra,* and that the entire arrangement between the bureau and the incompetent was contrary to public policy.

At the outset it may be well to note that for the purpose of convenience the American Research Bureau may be appropriately and advisedly referred to as an "heir chaser." It appears from the statement of its attorney of record on appeal that the "bureau" is in the business of "hunting heirs." During the oral argument on appeal the question arose relative to the method of fixing 40 per cent as a "fee." The attorney replied in substance that it was necessary to fix reasonably large fees so that the heirs who were found should pay for the losses incurred in the search for heirs who were not located by the bureau. Respondent's brief contains the statement that the "American Research Bureau [is] licensed by the State of California as a private investigator and *in the business of finding* missing heirs." (Emphasis added.)

A license to act as an investigator does not permit the practice of law. *Howe* v. *State Bar,* 212 Cal. 222 [298 P. 25], holds that the fact that the West Coast Claims Bureau possessed a license to act as an insurance adjuster did not make its business of making contracts with injured persons to take all the steps necessary to collect their claims lawful. (See *Townsend* v. *State Bar,* 210 Cal. 362 [291 P. 837] ; *Shaw* v. *State Bar,* 212 Cal. 52 [297 P. 532].) Such "ambulance chasing" is analogous to that of "heir chasing." (*Estate of Butler, supra,* p. 648.) A corporation may not engage in the practice of law by hiring attorneys to do the legal work. The same rule applies to individuals and associations. (*People* v. *Merchants Protective Corp.,* 189 Cal. 531 [209 P. 363].) If the "heir chaser," "for compensation controls, directs or influences" (*Howe* v. *State Bar, supra,* p. 230) the conduct of the probate proceedings or an "heir's" actions in an estate, it "amounts to 'commercial exploitation' of the legal profession and is contrary to public policy." (*Estate of Butler, supra,* p. 647.)

The majority opinion criticizes the form of the report of the guardian and suggests that the attorney was representing conflicting interests. I am not interested personally or offici-

ally with the activities of the attorney except to the extent that his actions or statements prove that the ''heir chaser'' was practicing law and that such practice was against public policy. (*Estate of Butler, supra.*) If it may be adjudged as practicing law when the ''heir chaser'' openly without any effort of hiding the facts, submits the matter upon the interpretation that may be placed upon a written instrument, for a greater reason it should be condemned when it is necessary to resort to an examination of circumstantial evidence submerged in a plan or device to evade the rule set forth in such cases as *Estate of Butler, supra; Estate of Reilly,* 81 Cal.App. 2d 564 [184 P.2d 922] ; *Estate of Seery,* 81 Cal.App.2d 971 [184 P.2d 626], and *In re Lynch's Estate,* 154 Misc. 260 [276 N.Y.S. 939].)

The only witness who testified in the present proceeding appears as (1) attorney for the administratrix in the *Estate of Ryker,* deceased, and (2) as attorney for the guardian in the *Estate of O'Donnell, an incompetent,* and (3) as attorney for the ''heir chaser'' in the presentation of the purported contract. His narration is set forth at length as follows: *''This case is similar to the last one.* The incompetent was confined to Talmage for many years. A lady died here who developed to be his half-sister. There is no record amongst her effects as to her relatives, *and my client, the American Research Bureau,* discovered the half-sister of this decedent, *procured a contract from her at the rate of 40 %.* The half-sister inherits one-half of the estate, and the incompetent brother, who was discovered *after* the signing of the lady in Bakersfield, gets one-half. *She signed up on the basis of 40% with the idea that she would ask the Court, she being the guardian of her brother, that the Court make the same allowance with reference to the incompetent.* There has been distributed to him already by partial distribution the sum of $10,000. The estate has not been closed because of litigation to the title of property, but he has already received $10,000, and there should be an allowance of the same rate of fee as the sister paid. I have a letter from her urging that the Court make that allowance.'' (Emphasis added.) At a subsequent hearing the same attorney testified: ''I am the attorney for the guardian in this matter, which is of the guardianship of Frank H. O'Donnell, who was committed to the Mendocino State Hospital some years ago as an intemperate. His time expired and he desired to stay on. He has been transferred to DeWitt

General Hospital at Auburn, and is there at the present time, and apparently intends to stay there. *He had two sisters; I am not sure whether full or half,* but they were Hazel Ryker and May F. Dunham. Hazel Ryker died last year without any apparent relatives, or any records as to her family. *We located this sister, Mrs. Dunham,* living in a small town out of Bakersfield——'' (Emphasis added.) Whereupon the witness was interrupted by the deputy attorney general with the question: *"Who is 'we'?"* (Emphasis added.) The witness replied: *"The American Research Bureau."* (Emphasis added.) Later the attorney testified that he was not the attorney "in this matter, but *I was brought in at their recommendation."* (Emphasis added.) He testified that the "incompetent . . . was discovered after" the sister Mrs. Dunham signed. His next statement is that *"She signed* up on the basis . . . she being the guardian of her brother, that she would recommend to the Court that the same allowance be made with reference to the incompetent." (Emphasis added.)

There would be no purpose in promising to ask the court to fix a stipulated amount as "fee" to the bureau if her brother was competent, in which event he could speak for himself. The only purpose of such a promise would be if the brother was incompetent. It does not require that an inference be drawn to prove this fact, as it appears in the testimony of the attorney that when Mrs. Dunham was located she was informed that her brother was an inmate of one of the state hospitals. This information was given to Mrs. Dunham "shortly before May 9, 1946," less than 11 days after Mrs. Ryker's death. It was at that time that Mrs. Dunham agreed with the "bureau" that she would make the "fee" recommendation. Subsequently she was appointed guardian. The attorney representing her as guardian was recommended by the bureau. Thereafter she was appointed administratrix. The attorney representing her as administratrix is the same attorney who represented her as guardian. The purported contract is upon a contingent basis. If $100,000 more or less should be recovered for the Hazel Ryker estate, the "heir chaser," subject to the approval of the probate court, will be compensated upon a 40 per cent basis upon each subsequent distribution according to the contention of the attorney. The "bureau's" attitude appears from the statement of the attorney that "It is not a question of how much work was to be performed, but the fact that these people went in on a percentage basis and located these individuals."

As further evidence that the ''heir chaser'' has assumed complete control of this litigation through its selected attorney, the following appears: The guardian did not sign the ''Guardian's First Account and Report'' except in the form ''By . . . Her Attorney.'' The report is verified by the same attorney. The ''Supplement to the Guardian's First Account and Report,'' which was requested by the probate judge as a means of showing the services performed, were reasonably worth the 40 per cent requested contains the following statement that Mrs. Dunham, the guardian, believes the amount ''to be fair and equitable because of various factors, including that without the aid of American Research Bureau neither she nor the incompetent would have received any part of the estate of Hazel Ryker, deceased, *and because said American Research Bureau performed the services purely upon a contingent basis, all at its own cost and expense.''* (Emphasis added.) This ''guardian's'' unverified report is also signed by the attorney as attorney for the guardian.

The ''heir chaser,'' through the selection of the attorney to direct Mrs. Dunham personally in her affairs of the estate and to control her in her actions as guardian of the incompetent, as demonstrated by his actions and the agreements with Mrs. Dunham, held the reins of litigation. If not identical in facts, this case is identical in results with *Estate of Butler, supra,* wherein the Supreme Court declared (p. 647) that the ''heir hunter'' had assumed ''complete control of litigation instituted on behalf of the beneficiaries.''

In the present case the results are as follows: Mrs. Dunham has received $10,000, $4,000 of which (40%) has been paid to the controller of the litigation. The incompetent has received $10,000, $4,000 of which through the efforts of the attorney and the guardian was marked for the treasury of the ''heir chaser.'' In brief, from the $20,000 partial distribution the half-sister of Hazel Ryker received $6,000; the estate of the incompetent, according to the present plan, will receive $6,000, and the controller of the litigation, $8,000. *This is only on the first distribution.* If respondent's position is correct, the same ratio of apportionment will be maintained in future distributions or increased on the basis of attorney fees for extraordinary services in determining title to property claimed by the estate of Ryker. In addition to the $4,000 to be received by the ''heir chaser,'' the guardian was instructed to pay $1,960 to Mendocino State Hospital and $40 per month

"until further order" to DeWitt State Hospital and $10 per month for the incompetent's personal account; $200 to the guardian for services; $300 to the attorney for services up to March 13, 1947 and $257.45 to reimburse the attorney for money advanced. It is not my intention to indicate that the amounts— except to the "heir chaser" —are improper, but they are listed to show that at the end of one month the incompetent's $10,000 estate would be decreased by a sum in excess of 66 per cent.

Respondent contends that if the contract was void because of transgressing public policy, the heir hunter still would be entitled to recover upon a quantum meruit, citing *Trumbo* v. *Bank of Berkeley*, 77 Cal.App.2d 704 [176 P.2d 376]. The Trumbo case recognizes the general rule which is controlling in the present matter, namely, that the law does not imply a promise to pay for services which are illegal or against public policy. (Restatement of the Law, Contracts, § 598, com. c.) The facts of that case were such that this court ruled as follows (p. 710) : ". . . it would be most unjust and inequitable to allow the promoters to take the benefits of respondent's efforts, all of which were legal, and then to be allowed to escape all liability on the ground that the consideration they agreed to furnish was illegal. The proper rule, amply supported by authority, is thus stated in 27 California Jurisprudence page 210, section 17 : '. . . if the services rendered under a void contract by one party thereto were not intrinsically illegal and the other party fails voluntarily to perform on his part, the former may recover as upon a quantum meruit for what the latter actually received in value, though no recovery can be had upon the contract.' " In the present case the services rendered by the American Research Bureau constitute the unlawful practice of the law and are contrary to public policy. For such intrinsically illegal services no quantum meruit recovery is allowed. (*Estate of Butler, supra.*)

The *Estate of Cohen*, 66 Cal.App.2d 450 [152 P.2d 485] is relied upon by the attorney and the "heir chaser" in support of their position. The judicial views as expressed in *Estate of Cohen*, when such conclusions are based upon facts as stated in that opinion, must be approved. In that case decedent died in 1938. A genealogist after considerable work located a sister of decedent approximately 28 months later and obtained from her an assignment of 30 per cent of whatever

amount might be recovered in consideration of revealing to the sister the funds and assets which she subsequently obtained. The assignment was duly filed with the county clerk of the county in which the probate proceedings were pending in accordance with the provisions of Probate Code, sections 530, 530.1. (See present Prob. Code, § 1021.1.) In the *Estate of Cohen*, the record does not disclose that any arrangements were made by the designated genealogist or "heir hunter," with an heir, devisee or legatee on the subject of arrangements to select an attorney for the heir. There, negotiations with the "heir hunter" were conducted by the heir's two adult sons and an attorney of her own selection. This court stated at pages 456-457 that "the evidence definitely shows that prior to and at the time of the execution of the assignment he not only informed those acting for appellant that he could not select a lawyer for her, but that he expressly refused so to do; furthermore the record shows that throughout the probate proceedings appellant was represented in and out of this state by attorneys of her own selection." In the Cohen case the agreement offered to the court for approval was made a part of the record; it was not invalid "as being repugnant to good morals and against public policy . . ." The distinction made in *Estate of Butler, supra*, p. 649, with respect to *Estate of Cohen* applies with equal force to the present case. The purpose of the Probate Code sections is to protect heirs from professional "heir chasers." (*Estate of Lund*, 65 Cal. App.2d 151 [150 P.2d 211].) The legal principles set forth in *Estate of Butler, supra*, are indeed guideposts leading to safety zones for the protection of "heirs" from "heir chasers."

The frame designed by the "heir chaser" does not fit the picture developed from the filed record and the evidence. No question is raised other than the propriety of the $4,000 "fee." That item should be stricken from the probate court's order.

Petitions for a rehearing or for a modification were denied May 12, 1948, and additional opinions filed.*

Respondent's petition for a hearing by the Supreme Court was denied June 10, 1948. Schauer, J., voted for a hearing.

---

*The opinions are printed *post*, p. 816.