H. E. TRUMBO, Respondent, v. BANK OF BERKELEY (a Banking Corporation) et al., Defendants; LESTER W. HINK et al., Appellants.

Clark, Nichols & Morton for Appellants.

Vincent W. Hallinan, James Martin MacInnis and Ray M. Greene for Respondent.

PETERS, P. J.—This action was instituted by plaintiff against the corporate and the individual defendants to recover damages for breach of a contract of employment. The complaint alleged two causes of action. The first was in the form of a common count for work, labor and services alleged to have been performed by plaintiff at the special instance and request of defendants, which services, it is alleged, were reasonably worth $5,000. The second cause of action alleges that the parties entered into an oral contract in February, 1944, whereby in consideration of certain services to be rendered and which were rendered by plaintiff, the defendants agreed to employ the plaintiff, upon the incorporation of the defendant Bank of Berkeley, as vice-president for life at a minimum salary of $300 per month; that defendants refused to perform; that plaintiff is willing to perform; that as a result plaintiff has been damaged in the sum of $21,000. The defendants denied all the material allegations of the complaint. The cause was tried before a jury. During the course of the trial the plaintiff dismissed as to the Fidelity Acceptance Corporation. A nonsuit on both causes of action was granted to the Fidelity Acceptance and Thrift Company and the Bank

of Berkeley, and to all defendants on the second cause of action. After these rulings the trial proceeded, limited to the common count against the five individual defendants. The jury brought in a verdict of $5,000, and, from the judgment entered on the verdict, the five individual defendants appeal.

The evidence most favorable to respondent shows that he has had many years of banking and financial experience; that as early as 1906 he worked for the Farmers and Merchants Bank of Oakland, starting as a runner and finally becoming assistant treasurer, doing primarily accounting work; that in 1910 and 1911, and again in 1919 and 1920, he worked for the Mission Savings Bank as bookkeeper, treasurer, appraiser and loan officer; that during 1922 through 1924 he was employed by the American Trust Company to procure for that bank suitable locations for some 28 branch banks; that he did personnel work for these banks and took some six or eight banking courses from the American Banking Association; that since then he has been connected with the real estate and related businesses; that as early as 1934 he became interested in Berkeley as a likely location for an independent bank; that he gave the project up then because of the depression; that in January, 1944, his interest was again revived in the project; that he talked the matter over with the Superintendent of Banks who told him that such a project, properly worked out, would be looked upon with approval by his office; that he discovered that the five appellants, all of whom are directors in the two Fidelity companies and are prominent Berkeley citizens, had, some time in the past, been interested in organizing a Berkeley bank but had failed to complete the plan; that in January, 1944, he visited the appellant Hink; that he told Hink that he was familiar with his past efforts and inquired if he was still interested in organizing an independent bank in Berkeley; that Hink told him that he was still very much interested in such a proposal; that he outlined to Hink his ideas of the project; that Hink told him that he was connected with the two Fidelity companies and that those companies were interested in such a project, and suggested that respondent discuss the matter with appellant Hittell, who was general manager of the two Fidelity corporations; that he then met with Hittell; that he talked with Hittell at length and explained to him, in detail, his ideas on the subject; that Hittell evidenced great interest and stated that he would discuss the matter with Hink; that he continued to work out

details of the project and discussed them with Hittell and others; that in February, 1944, he was summoned to a meeting with the five appellants; that at this meeting the project was discussed at length; that the appellants expressed the desire that he should go ahead with the project, and particularly requested him to keep in touch with the Superintendent of Banks to see to it that a permit was secured; that then the subject of his employment was discussed and appellant Clark suggested that the group raise $500 to pay to respondent to carry him over a short while until the bank got under way; that he agreed to this suggestion, but later the group determined that they needed this money to organize the bank; that the appellants then asked him what he expected for his efforts and he replied that he was willing to accept a vice-presidency at $300 a month with an increase of $50 per year, and an increase over that if the directors felt so inclined; that the appellants agreed to this proposal; that he related to appellants his experience in the banking field and that they stated that none of them had had any banking experience and they expressed the need for his guidance; that he told the appellants that he expected to make this his lifetime work; that the $500 offer which he accepted, and which was later withdrawn and never paid, was intended as compensation for his services in addition to his employment by the bank; that it was his understanding that appellants were to become directors of the new bank. It should be here mentioned that when the new bank was incorporated on December 4, 1944, the five appellants became five of the nine directors, and Hittell became the president. The respondent then recounted at length what he did to assist in the organization of the bank. He testified that from January, 1944, to December of that year he devoted practically full time to the enterprise; that he interviewed the Superintendent of Banks on many occasions; that he secured information for the Superintendent of Banks required before a permit would be granted; that he discussed with the superintendent the procedure to be followed; that he discussed all details with all appellants on many occasions; that he secured copies of the Bank Act and went over the statute with Clark; that at Clark's suggestion he prepared a detailed plan of operation for the bank; that he made a detailed study of traffic problems in Berkeley in order to locate a proper site for the new bank; that he looked over and investigated eight different sites; that he went over these pro-

posed sites in detail with Hittell; that he made sketches of a proposed layout for the bank; that he investigated the ownership of some of the proposed sites and discussed purchase with the owners; that with one owner he had twenty-five to thirty conferences and got him to come down materially in his price; that all during this time appellants reassured him that he would secure employment in the bank when it was organized; that he discussed prospective purchasers of stock and advertising being used to secure investors; that he located second-hand banking equipment; that on December 1, 1944, the appellants put one Harrison on the payroll and told respondent to work with him; that he then began to realize that he was being pushed aside; that he then visited all of the appellants individually and demanded to know if he was going to get the promised job; that he was referred back to Hittell; that he got no satisfaction from Hittell; that he again visited Hink and Hink offered him $1,000 in full settlement of his claims, which he refused; that Hink told him that was the best that could be done for him and again referred him to Hittell; that Hittell told him that there was no room in the bank for him, and referred him to Attorney Clark; that Clark refused to do anything about the matter; that then, on December 12, 1944, he wrote to each of the appellants demanding either that they give him the promised job or the sum of $5,000 for his services. Clark, by letter, denied any liability to him by the bank or appellants.

The evidence of appellants directly contradicts much of this testimony. They testified that no agreement was ever made, and that it was simply understood that respondent was to go along on the deal, and that if, after the bank was formed, he was satisfactory to the directors, and if a place could be found for him, he might secure employment from the bank. The appellants sought to minimize the value of the work done by respondent and testified that nothing respondent did was of any material value to them. These conflicts were for the trial court and will not further be considered on this appeal.

The main contention of appellants is that the contract of employment set forth in the second cause of action was illegal. It is urged that the parties were *in pari delicto,* and that for that reason respondent cannot recover directly or indirectly on the contract; that no recovery will be allowed on the common count; that a contract such as this to employ respondent for life as a vice-president is necessarily illegal because to

carry out such a contract appellants would have to control the majority of the stock or the board of directors; that in any event any contract that would impair their untrammeled discretion in selecting proper employees or officers is illegal; that a contract that would either subject them to a damage suit or compel them to select respondent for the position in question violates fundamental rules of public policy.

There can be no doubt that a contract by a director or shareholder, at least of an existing corporation, whereby it is agreed that a designated person will be put or maintained in office, or by which, in any other way, a director attempts to contract away his discretionary vote on the board of directors is violative of public policy and is void. (See *Seitz* v. *Michel*, 148 Minn. 80 [181 N.W. 102, 12 A.L.R. 1060]; *Van Slyke* v. *Andrews*, 146 Minn. 316 [178 N.W. 959, 12 A.L.R. 1068]; *Hellier* v. *Achorn*, 255 Mass. 273 [151 N.E. 305, 45 A.L.R. 788]; *West* v. *Camden*, 135 U.S. 507 [10 S.Ct. 838, 34 L.Ed. 254]; see annotations 12 A.L.R. 1070; 45 A.L.R. 795.) There are, however, many cases that hold that contracts of promoters relating to future employment by the proposed new corporation are not void, but may either be ratified by the new corporation or enforced against the promoters. (See discussion and collection of cases 1 Fletcher, Cyc. Corp. (perm. ed.), p. 691, § 208; ibid. p. 700, § 211; ibid. p. 601, § 191; *Puller* v. *Royal Casualty Co.*, 271 Mo. 369 [196 S.W. 755]; *Mansfield* v. *Lang*, 293 Mass. 386 [200 N.E. 110].) It might well be argued that, under this last cited rule, the contract pleaded against the appellants in the second cause of action was not illegal. But such discussion would only be of academic interest because, in the instant case, recovery was not had for breach of the contract to employ as vice-president, which, for the purposes of this opinion, we may assume was illegal or void, but for failure to pay the reasonable value of services actually rendered to the promoters at their request. Appellants contend that when an illegal contract is relied upon, regardless of the form of the action in which it is presented, the court will not enforce it, but, under the doctrine of *in pari delicto*, will leave the parties where it finds them. Such cases as *Domenigoni* v. *Imperial Live Stock etc. Co.*, 189 Cal. 467 [209 P. 36], and *Haruko Takeuchi* v. *Schmuck*, 206 Cal. 782 [276 P. 345], and other similar cases are cited in support of this rule. Those cases all deal with services rendered where

the acts relied upon to constitute performance were at least in part illegal. In such a situation recovery will not be permitted either on an express or implied contract. But that is not the situation here. In this case respondent was not allowed to recover for breach of the oral contract to employ, but for the reasonable value of the services rendered to the promoters prior to incorporation. There was nothing illegal or against public policy in the nature of those services. While the major consideration expected by respondent was a position in the bank, it would be most unjust and inequitable to allow the promoters to take the benefits of respondent's efforts, all of which were legal, and then to be allowed to escape all liability on the ground that the consideration they agreed to furnish was illegal. The proper rule, amply supported by authority, is thus stated in 27 California Jurisprudence page 210, section 17: "The law does not imply a promise to pay for services illegally rendered under a contract expressly prohibited by statute. But if the services rendered under a void contract by one party thereto were not intrinsically illegal and the other party fails voluntarily to perform on his part, the former may recover as upon a quantum meruit for what the latter actually received in value, though no recovery can be had upon the contract."

Thus in *Sims* v. *Petaluma Gas Light Co.*, 131 Cal. 656 [63 P. 1011], the plaintiff was allowed to recover for the reasonable value of his lawful services, although the written contract to construct water gas apparatus between the president of the defendant company on behalf of the corporation on one side and the president as an individual and another on the other was invalid, and against public policy. In that case, as in this, the plaintiff sued upon the written contract and upon a quantum meruit. After holding that the written contract was void as against public policy the court held that: "The plaintiff could not recover on the written contract, but he might recover as upon a *quantum meruit*, for what the defendant actually received in value." (P. 660.)

Another case directly in point is *Wiley* v. *Silsbee*, 1 Cal. App.2d 520 [36 P.2d 854]. In that case an attorney entered into a written contract to render professional services to a wife in a divorce action, she agreeing to pay him a percentage of whatever was recovered from her husband on a property settlement. After the services had been rendered the wife refused to pay and the attorney brought suit stating three

causes of action, one of which was on a quantum meruit. The court first held that the written contract was void as against public policy but held that, nevertheless, the plaintiff could recover for the reasonable value of his services. At page 522 it is stated:

"It is likewise now established as a proposition of substantive law that in a case of a contract to pay for services which is void as against public policy, there arises an implied contract to pay for services rendered thereunder, and the remedy of action sounding in *quantum meruit* is available to recover the reasonable value thereof. In *Ayres* v. *Lipschutz* [68 Cal.App. 134 (228 P. 720)], on hearing by the Supreme Court, it was stated: 'The contract being void as against public policy afforded no basis for a recovery which could have been had only upon a *quantum meruit.*' In *Theisen* v. *Keough* [115 Cal.App. 353 (1 P.2d 1015)], plaintiff sued on a contract very similar to the one here involved in one cause of action and joined therewith a second cause on *quantum meruit*. The trial court adjudged the contract void as against public policy and as to the *quantum meruit* cause found that plaintiff had been fully paid. On appeal, the court, after quoting from the case of *Ayres* v. *Lipschutz, supra,* the same paragraph as hereinabove quoted, said: 'We, therefore, find the parties with no agreement or contract regulating the compensation to be paid; the attorney proceeding with the cause under the implied contract that he will be compensated in a reasonable amount for services performed.'" (See, also, *Kyne* v. *Kyne,* 74 Cal.App.2d 563 [169 P.2d 272]; *Woods* v. *Watson,* 46 Cal.App.2d 399 [115 P.2d 863].)

■ The contention of appellants that no recovery can be had on the quantum meruit because the evidence shows that the preincorporation services were intended to be rendered without compensation is not sound. The evidence of the offer of $500 made at the first meeting of the parties, and the offer of appellant Hink to pay $1,000 in settlement for the services rendered, demonstrates that no one concerned believed the services were to be gratuitous. Of course the respondent rendered the services in the hope of securing the vice-presidency offered to him, but that very fact also demonstrates that the services were not to be gratuitous. His services being lawful, even though the respondent could not compel appellants to pay the promised consideration, he can recover for the reasonable value of such services.

■ The last main contention of appellants is that the evidence does not support the judgment as to the amount of damages. In this connection appellants rely mainly on their own evidence to the effect that all that respondent did was to do a lot of running around seeking locations, and doing other things, and that these services were of no value to them. The evidence and the reasonable inferences therefrom produced by respondent supports the implied finding of the jury that the services rendered were of material, substantial benefit to appellants. ■ But, say appellants, even if this is so, there was no expert evidence introduced by respondent from which the jury could fix the reasonable value of the services. It is urged that while the trier of the fact may fix the reasonable value of services without opinion evidence where the issue involves the value of something where such value is a matter of common knowledge, expert testimony is necessary where the problem involves the value of services of a nature where such value is not a matter of common knowledge. (*Ferrari* v. *Mambretti,* 58 Cal.App.2d 318 [136 P.2d 326].) The services here involved have already been summarized. They were not of a technical nature. They were of a type that their value could be appraised by any reasonably intelligent layman. That this is so is illustrated by the case of *Geisenhoff* v. *Mabrey,* 58 Cal.App.2d 481 [137 P.2d 36]. In that case the plaintiff sued for the reasonable value of services rendered to defendants in promoting an ice rink. The services rendered included arranging for credit for the project with various firms; furnishing an office as a headquarters; handling, on occasion, the numerous details involved in supervising the construction of the rink; the securing of employees for the new project; securing publicity; and dealing with creditors who were pressing defendants for payment. It was there held that the trier of fact was competent to fix the reasonable value of the services from the evidence of their nature and extent. At page 488 this court stated: "Before, considering to what extent the individual defendants as well as the corporation Ice Bowl, Inc., are liable to plaintiff, the contention that there is no evidence of the value of his services may be disposed of. Defendants object that no witness testified as to that value. We are of the view that this is a situation where it was competent for the trial judge to determine the worth of the services from the testimony as to their nature and extent. (*Seib* v. *Mitchell,* 10 Cal.App.2d 91 [52 P.2d 281]; *Nylund* v. *Madsen,* 94 Cal.

App. 441 [271 P. 374]; *Lundberg* v. *Katz,* 44 Cal.App.2d 38 [111 P.2d 917].) There are types of technical service with which a judge or jury may be too unfamiliar to make a determination without expert testimony, but the services here are not of that kind.''

In the instant case the jury has fixed the reasonable value at $5,000. The trial judge did not reduce the judgment in passing on the motion for a new trial. We cannot say, as a matter of law, that these determinations were unreasonable. Certainly, if the trier of the fact was qualified to fix the value of the services without opinion evidence in the Mabrey case, the judge and jury in the instant case were equally qualified to fix the value of the services here involved.

The judgment appealed from is affirmed.

Ward, J., and Schottky, J. pro tem. concurred.

[Civ. No. 13258. First Dist., Div. One. Jan. 20, 1947.]