[Civ. No. 27743. First Dist., Div. One. May 19, 1972.]

SOUTH TAHOE GAS CO., Plaintiff and Respondent, v. HOFMANN LAND IMPROVEMENT CO., INC., et al., Defendants and Appellants.

**COUNSEL**

James R. Madison and Orrick, Herrington, Rowley & Sutcliffe, for Plaintiff and Respondent.

Fred F. Cooper for Defendants and Respondents.

**OPINION**

**SIMS, J.**—Defendants, a corporation which contracted with plaintiff utility for a gas main extension into a tract it was developing, and a second corporation which guaranteed the former's liability under that contract, have appealed from a judgment which awarded the utility $8,562 plus interest, representing the charges for the extension at the effective approved rates for such an extension adjusted for allowable refunds. They contend that the contract for the extension was illegal and unenforceable because the utility contracted to charge for the extension at $3.35 per foot when its allowable rate for such extensions as filed with the State Public Utilities Commission was $2 per foot, and that they were relieved of any liability for the extension because of the utility's fraud.

A review of the record and the applicable law reflects that although the purported charge of $3.35 per foot was acknowledged to be illegal, the trial court properly concluded that the utility was entitled to recover at the $2 rate fixed in the filed and approved rules, and that there is no merit in defendants' contention that the fraud, if any, of the utility precluded it from recovering these charges. The foregoing conclusions make it unnecessary to consider the utility's contention that it was entitled to recover on an account stated.[1] The judgment must be affirmed.

The trial court found that on September 26, 1966 the utility and

---

[1]The complaint contained four causes of action, first, to recover on the contract at the rate of $2 per foot less allowable credits; second, to recover in accordance with its tariff schedule at the rate of $2 per foot; third, on an account stated; and fourth, on an open book account. The court found that the correspondence between the parties did not constitute an account stated.

the developer entered into a contract under which the utility undertook to install a gas main extension to supply dwelling units to be located in the developer's tract. The contract states in pertinent part:

"The gas main extension applied for will be installed by the Company in accordance with the provisions of its filed Rule No. 15, relating to extension of main for subdivisions, tracts, housing projects, and multi-family dwellings.

"The estimated cost of said gas main extension is $30,000.00, consisting of approximately 9,000 feet of main at a unit cost of $3.35 per foot."

The contract refers to, and has annexed to it a copy of, section C-1a of rule No. 15 which provides for payment of the entire estimated cost of the extension, provided that payment of such sums as it appears would be refunded within six months may be postponed if the utility is given evidence that the development will proceed promptly, and if the developer agrees to pay, at the end of the period, any balance of the amount which otherwise would have been advanced that is not refundable. The contract provides for payment in the latter manner, and for a guaranty to be approved by the utility. This guaranty, as found by the court, was furnished by the developer's codefendant.

The contract concludes: "This agreement is subject to the Company's tariff schedules and the refund provisions thereof on file with the Public Utilities Commission of the State of California and particularly to the Company's rule 15. The Applicant acknowledges that it has made itself familiar with the provisions of rule 15 and that it is aware that a copy thereof is available for inspection at the offices of the Company in Tahoe Valley, California. Determination of the amount which would have been refunded by the Company under rule No. 15 during the above mentioned 6 months period shall be made by the Company in accordance with the provisions of said rule 15 and the Company's standard form of contract for gas main extension pursuant thereto, a copy of which is attached hereto as Exhibit B and the terms and conditions of which form a part of this agreement."

The contract form attached to the principal document has inserted the figure of $3.35 per foot. It again refers to Rule 15 and states: "A copy of Rule 15 will be provided on request." The reverse of the form sets forth the terms upon which refunds against the cost of the extension will be granted when service connections are made with the extended gas main.

At the time the contract was entered into, rule No. 15, entitled "Gas

Main Extensions," which had been filed with the Public Utilities Commission on May 24, 1960, pursuant to the provisions of section 489 of the Public Utilities Code,[2] provided in pertinent part: ". . . [¶] B. Free Extensions to Individual Applicants for Service. [¶] 1. Free Footage Allowances. . . . [¶] 2. Conditions. . . . [¶] 3. Main Extensions Beyond The Free Length. [¶] a. Advances. [¶] (1) Extensions of mains beyond the free length will be made by the utility provided applicants for such extensions advance to the utility $2.00 for each foot of main in excess of the free length. Such extensions will be owned, operated and maintained by the utility. . . ."

The foregoing rule, effective May 29, 1960 was not revised (see Pub. Util. Code, §§ 454, 455 and 491) until May 20, 1968 (except for a special condition in effect from May 17, 1965 for one year which is not pertinent here) when the rate for extensions covered by the above paragraph was increased from $2 to $3.05 per foot.

The court found: "The estimated cost was misstated by South Tahoe in [the contract] in that the rate of charge for gas main extensions provided in South Tahoe's Tariff Rule 15 as of the time of said agreement was $2.00 per foot."[3]

The court further found: "The charge of $3.35 per foot for extensions set forth in [the contract] is illegal as contrary to South Tahoe's Rule 15. The court determines that [the contract] should be interpreted as excluding the improper charge and including the proper charge of $2.00 per foot."

The utility extended its gas mains as required by the contract and brought this action to recover at the rate of $2 per foot less allowable

---

[2]Public Utilities Code section 489 provides: "Under such rules as the commission prescribes, every public utility other than a common carrier shall file with the commission within such time and in such form as the commission designates, and shall print and keep open to public inspection, schedules showing all rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected or enforced, together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service. Nothing in this section shall prevent the commission from approving or fixing rates, tolls, rentals, or charges, from time to time, in excess of or less than those shown by such schedules."

[3]It appears to be assumed that the applicable rate per foot for an extension is to be found in part B of rule No. 15 which deals with "Free Extensions to *Individual Applicants* for Service." (Italics added.) It is arguable that part C, which is entitled "Main Extensions to Serve *Subdivisions, Tracts,* Housing Projects and Multi-Family Dwellings," (italics added) is *sui generis* and means what it says in referring to the "cost of such extensions." No opinion is expressed on this point because in this case the utility at all times has conceded that the rate set forth in part B is applicable.

refunds. Other facts concerning the negotiations between the parties are set forth below.

## I

In their answer the defendants alleged "that the agreement sued upon by plaintiff herein was illegal and violative of the laws of the State of California and the regulations of the Public Utilities Commission of the State of California." They attack the finding that the contract "should be interpreted as excluding the improper charge and including the proper charge of $2.00 per foot."

Civil Code section 1668 states in pertinent part, "All contracts which have for their object, directly or indirectly, . . . violation of law, whether wilful or negligent, are against the policy of the law."

Section 1667 reads, "That is not lawful which is: 1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals."

Section 1607 provides, "The consideration of a contract must be lawful within the meaning of section 1667."

Section 1608 states, "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void."

The court properly found that a charge in excess of the prescribed rates was illegal. (Cf., however, fn. 3 above.) Public Utilities Code section 532 provides in pertinent part, ". . . no public utility shall charge, or receive a different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and charges applicable thereto as specified in its schedules on file and in effect at the time, . . ." That code further provides that the Public Utilities Commission may order that the public utility make reparation if it has charged an unreasonable, excessive, or discriminatory amount for any product or commodity furnished or service performed (§ 734); that a court action may be brought for the payment of such reparation (§ 735); that a court action may be brought for damages resulting from a violation of the provisions of section 532 (§ 736); that exemplary damages may be awarded for a wilful violation of the provisions of the state Constitution, any state law, or any order or decision of the commission (§ 2106); that the utility may be liable for penalties for such a violation (§ 2107); and that an officer, agent or employee who

is responsible for such a violation may be subject to criminal prosecution (§ 2110).

In support of their contention that the entire contract is void and that the utility, therefore, cannot recover any compensation for the extension of the gas main which it has constructed, defendants rely on the following principle: "The general rule is that a void contract, a contract against public policy or against the mandate of a statute, may not be made the foundation of any action, either in law or in equity. [Citations.]" (*Hooper* v. *Barranti* (1947) 81 Cal.App.2d 570, 574 [184 P.2d 688]. See also *Smith* v. *Bach* (1920) 183 Cal. 259, 262-263 [191 P. 14]; *Berka* v. *Woodward* (1899) 125 Cal. 119, 126-127 [57 P. 777]; *Stockton Morris etc. Co.* v. *Calif. etc. Corp.* (1952) 112 Cal.App.2d 684, 689 [247 P.2d 90]; and *Del Rey Realty Co.* v. *Fourl* (1941) 44 Cal.App.2d 399, 402-403 [112 P.2d 649].) In the case last cited the court quoted with approval from 6 California Jurisprudence, page 153, as follows: " 'The rule as to the nonenforceability of illegal contracts is not based upon any consideration for the party against whom the relief is sought, and who may be benefited by the refusal of the court to grant the same, but upon consideration of sound public policy. It is not for the sake of a party, but for the sake of the law itself, that a court refuses to be made use of for the enforcement of illegal contracts and leaves the parties where it finds them.' " (44 Cal.App.2d at p. 403; and see 12 Cal.Jur.2d, Contracts, § 98, pp. 297-298.)

The foregoing cases do not cover the situation presented by the contract in this case. *Berka* v. *Woodward* and the *Stockton Morris Plan Company* case involve contracts by public bodies. In the former case a city council member was denied compensation for lumber and materials furnished to the city. Not only did the city charter and state law prohibit such a contract, but also state law expressly provided that the contract could be avoided at the instance of any party except the interested official (see 125 Cal. at pp. 121-122). In the latter case the contract was invalid because it was not executed by the requisite number of members of the governing body of the public entity and because it violated a constitutional proscription against the incurring of a future indebtedness (112 Cal.App. 2d at p. 687). In *Hooper* the contract contemplated that a partnership would conduct an on-sale liquor business under an individual's license in violation of the Alcoholic Beverage Control Act (81 Cal.App.2d at p. 575). In the *Realty Company* case the agreement provided for rendering compensation to an unlicensed person in violation of the California Real Estate Act (44 Cal.App.2d at p. 403). In *Smith* v. *Bach* there was a violation of a subdivision map act.

In the instant case there is no law against contracting for the extension of a gas main. It is only the amount that can be charged which is regulated. There is no express provision in the Public Utilities Code prohibiting recovery of compensation as is the case under the state contractor's licensing act (see Bus. & Prof. Code, § 7031; and *Lewis & Queen* v. *N. M. Ball Sons* (1957) 48 Cal.2d 141, 150-151 [308 P.2d 713]), and the real estate act (see Bus. & Prof. Code, § 10136; and *Del Rey Realty Co.* v. *Fourl, supra,* 44 Cal.App.2d 399, 402). In fact, as reviewed below, the Public Utilities Code, expressly requires that the prescribed compensation be collected.

Civil Code section 1598 provides: "Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."

Section 1599 reads, "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."

In *Pitts* v. *Highland Construction Co.* (1953) 115 Cal.App.2d 206 [252 P.2d 14], a contractor sought to recover compensation due under a secret agreement which violated the provisions of law under which a "G.I." loan, guaranteed by the Veterans Administration, had been obtained to pay for the ostensible costs of construction. The court reversed a judgment for the owner-borrower because the lower court had refused to permit the contractor to recover for extra work which was contemplated under the original disclosed and legal agreement. The court quoted from 2 Kent's Commentaries, 467, as approved in an early usury case (*Jackson* v. *Shawl* (1865) 29 Cal. 267, 272) as follows: " '. . . The general and more liberal principle now is, that when any matter, void even by statute, be mixed up with good matter, which is entirely independent of it, the good part shall stand and the rest be held void.' " (115 Cal.App.2d at p. 212.)

Here the contract is, at worst, ambiguous. Throughout it refers to rule 15. "Pertinent rules and regulations which the Public Utilities Commission requires a public utility to adopt and file with the commission automatically become an implied term of any contract made between that public utility and its customer. (*Hischemoeller* v. *National Ice etc. Storage Co.,* 46 Cal.2d 318, 325 . . .; *Gardner* v. *Basich Bros. Constr. Co.,* 44 Cal.2d 191, 193-194 . . .; *Cole* v. *Pacific Tel. & Tel. Co.,* 112 Cal.App.2d 416, 418 . . . .)" (*Sherwood* v. *County of Los Angeles* (1962) 203

Cal.App.2d 354, 359 [21 Cal.Rptr. 810].) In *Sherwood* the court upheld a judgment which denied the trustee successor to a public utility, which had extended its water mains to a "Civic Center" area after negotiations with the defendant county, any recovery for the costs of the extension because the mains had been installed and used without any contract for repayment. The court stated, "Any claim of liability asserted against the customer must find support in the terms, express or implied, of that contract. Thus, with respect to certain rates fixed by law, it was said in *Church v. Public Utilities Com.,* 51 Cal.2d 399 . . . at page 401: 'The law, however, does not create the liability. It only determines the amount of the liability created by the agreement of the parties.' (See also *Gardner v. Basich Bros. Constr. Co., supra,* 44 Cal.2d 191, 194.)" (*Id.*) Defendants argue that the contract was void because it provided for an illegal rate, and that therefore there is no liability upon which to predicate a recovery at the rate fixed in rule 15. This overlooks the fact that the contract expressly, as well as impliedly, refers to the rule, and therefore to the rates set forth therein.

The applicable principle is expressed in Civil Code section 1643 as follows: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (See *Barham v. Barham* (1949) 33 Cal.2d 416, 429 [202 P.2d 289]; and *Fadel v. Slayman* (1948) 84 Cal.App.2d 6, 9 [189 P.2d 771].)

The construction adopted by the court is also supported by the principle ". . . that all the consequences which attend a contract contrary to public morals do not attend one which is purely *malum prohibitum,* and that in the latter case courts will take notice of the circumstances and will give relief if justice and equity require a restoration of money received by either party thereunder. [Citations.]" (*Smith v. Bach, supra,* 183 Cal. 259, 263. See also *Berka v. Woodward, supra,* 125 Cal. 119, 122-124; and *Trumbo v. Bank of Berkeley* (1947) 77 Cal.App.2d 704, 710-711 [176 P.2d 376].) This principle is usually applied "to aid one not in *pari delicto,* though to some extent involved in the illegality, but who . . . is comparatively the more innocent, and to permit him to recover back money paid on a contract as the circumstances of the case may require. [Citations.]" (*Smith v. Bach, supra,* 183 Cal. at pp. 263-264.) Nevertheless, in *Berka v. Woodward, supra,* it was noted that when a contract is illegal because of a breach of a fiduciary duty the following rule applies: "If he [the party to be protected] shall elect to rescind, he does so upon the equitable condition of restoring what he has received. If, however, he chooses to retain the consideration, he is not bound by

the terms and conditions of the contract, but the courts permit an action to establish and to recover the reasonable value of the thing sold or the service rendered. Such, it may be said, is the general rule, but in this state the line has been more closely drawn. Such contracts are against public policy. Being against public policy, the making of them is not to be encouraged. But to permit a profit is thus to encourage them. Therefore, in this state, when a recovery is permitted, it is not for the reasonable or market value, which naturally includes within it the contemplation of a profit, but, when possible, the recovery is limited to the actual cost. [Citation.]" (125 Cal. at pp. 123-124.) In *Trumbo* v. *Bank of Berkeley, supra,* the principle was applied to permit recovery for services rendered in pre-incorporation activities pursuant to a contract which was illegal because in violation of the duties of the directors of the proposed corporation. The court noted, " . . . it would be most unjust and inequitable to allow the promoters to take the benefits of respondent's efforts, all of which were legal, and then to be allowed to escape all liability on the ground that the consideration they agreed to furnish was illegal." (77 Cal.App.2d at p. 710.) So here the defendants should not be permitted to obtain the advantages of the gas main extension and yet disclaim any responsibility to reimburse the utility for the lawful costs incurred.

 "The rule denying recovery to a party to an illegal contract is subject to a wide range of exceptions. . . . In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. [Citations.]" (*Emmons, Williams, Mires & Leech* v. *State Bar* (1970) 6 Cal.App.3d 565, 569 [86 Cal.Rptr. 367].) Among the factors noted in that case were the fact that the party claiming illegality would be unjustly enriched if the other party were denied recovery, and that the forfeiture from refusal to permit recovery would be harsh in proportion to the character and extent of illegality. (*Id.,* at p. 570.) Similar results would obtain here if defendants' contentions were sustained.

 Defendants insist that a forfeiture should be enforced in this case because it is the policy of the law to discourage illegal conduct. (See *Lewis & Queen* v. *N. M. Ball Sons, supra,* 48 Cal.2d 141, 147-148; and *Berka* v. *Woodward, supra,* 125 Cal. 119, 124.) The provisions of the Public Utilities Code, which were referred to in the opening paragraphs of this part of the opinion, should sufficiently discourage attempts to overcharge. A utility, which is subject to civil and penal penalties for such conduct and whose officers and employees are subject to criminal prosecution, is not apt to wilfully or intentionally engage in such practices. In the absence of any provision expressly excluding any recovery under such

a contract, the trial court properly permitted the utility to recover for the extension at the filed and approved rate.

## II

In this case the question of illegality must also be viewed in the light of plaintiff's status as a public utility. It has been stated, with respect to a common carrier, "The carrier cannot by contract, conduct, estoppel, waiver, directly or indirectly increase or decrease the rate as published in the tariff of the carrier until the published tariff itself is changed." (*Transmix Corp.* v. *Southern Pac. Co.* (1960) 187 Cal.App.2d 257, 264 [9 Cal.Rptr. 714].) It is established that a shipper may recover in court charges he has paid in excess of the legally established rates. (See *California Adj. Co.* v. *Atchison etc. Ry. Co.* (1918) 179 Cal. 140, 146-148 [175 P. 682, 13 A.L.R. 274]; *Transmix Corp.* v. *Southern Pac. Co., supra; Southern Pacific Co.* v. *Superior Court* (1915) 27 Cal.App. 240, 251-255 [150 P. 397, 404]; and *Sunset Pac. Oil Co.* v. *Railroad Co.* (1930) 110 Cal.App.Supp. 773, 782 [290 P. 434].) In *Southern Pacific Co.* v. *Superior Court* it was noted that the shipper was not claiming that he was entitled to recover all that he had paid because it was an unlawful charge, but only that sum which was in excess of the lawful rate (27 Cal.App. at p. 245). In the *Sunset Pacific Oil Co.* case the court stated, "Under the provisions of section 17 of the Public Utilities Act [cf. Pub. Util. Code, § 494; and note § 532 as set forth above] the measure of damages for the collection of a rate in excess of that provided in the tariff is necessarily the difference between the rate assessed and that which was applicable." (110 Cal.App.Supp. at p. 782.)

The principle that the whole overcharge does not cause a forfeiture of the legal charge is necessitated by the strong policy against permitting discounts or rebates. (See *Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 967-968 [59 Cal.Rptr. 836, 429 P.2d 156]; *West* v. *Holstrom* (1968) 261 Cal.App.2d 89, 92, 93 [67 Cal.Rptr. 831]; *People* ex rel. *Public Util. Com.* v. *Ryerson* (1966) 241 Cal.App.2d 115, 120 [50 Cal.Rptr. 246]; *Southern Pacific Co.* v. *Fish* (1958) 166 Cal.App.2d 353, 364 [333 P.2d 133]; *Gardner* v. *Rich Mfg. Co.* (1945) 68 Cal.App.2d 725, 729-730 [158 P.2d 23]; and *Butler* v. *Bell Oil & Refining Co.* (1945) 70 Cal.App.2d 728, 730 [161 P.2d 559].) "The collection of undercharges . . . has been held to be one of the most effective means of preserving the minimum rate structure and of eliminating collusion between carriers and shippers. [Citations.]" (*People* ex rel. *Public Util. Com.* v. *Ryerson, supra,* 241 Cal.App.2d at p. 120.) It is also necessary "to maintain the integrity of the orders of the Public Utilities Commission. [Cita-

tions.]" (*West* v. *Holstrom, supra,* 261 Cal.App.2d at p. 92.) In such an action the customer cannot defeat the recovery of the undercharge, discount or rebate by claiming the contract was illegal. (See *Southern Pacific Co.* v. *Fish, supra,* 166 Cal.App.2d at p. 364.)

It is true that in cases involving the regulation of highway carriers there is an element of ruinous competition (see *Keller* v. *Thornton Canning Co., supra,* 66 Cal.2d at p. 967) which does not mark the business of a monopolistic utility. Nevertheless the same principles have been applied to prevent discrimination between customers of a railroad. In *Transmix Corp.* v. *Southern Pac. Co., supra,* the court quoted with approval and added emphasis from *New York, N.H. & H.R. Co.* v. *York & Whitney Co.* (1913) 215 Mass. 36, 40 [102 N.E. 366, 368] (writ of error dismissed (1915) 239 U.S. 631 [60 L.Ed. 477, 36 S.Ct. 166]) as follows: " '. . . the reason why there must be *inflexibility* in the enforcement of the published rate *against all and every suggestion for relaxation* rests upon the practical impossibility otherwise of maintaining equality between all shippers without preferential privileges of any sort. The rate when published becomes established by law. It can be varied only by law, and not by act of the parties.' " (187 Cal.App.2d at p. 265, italics the court's; and see *West* v. *Holstrum, supra,* 261 Cal.App.2d at p. 93.)

In this case if the utility is prohibited from collecting the legally approved charge, the defendant developer will be receiving a rebate of the approved cost of the services rendered by extending the mains. Moreover if the outlay reduces the capital of the utility it may either impair its ability to serve its other customers, or produce a dispute as to whether the rates in effect and collected furnish its stockholders a fair return. It is established that a public utility furnishing water must furnish the services set forth in its schedule of rates, rules and regulations. (See *Vila* v. *Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 474-475 and 479 [43 Cal.Rptr. 654].) By the same token the court did not err in requiring the defendants to pay for the services received at the approved rate.

## III

As a third affirmative defense defendants alleged, ". . . that their consent to the agreement and guaranty referred to in the Complaint were obtained by fraud by the misrepresentation of plaintiff that the agreements plaintiff requested defendants to sign complied with the laws of the State of California and the regulations of the Public Utilities Commission of the State of California. That plaintiff represented that said agreements and

guaranty did so comply when in fact, plaintiff well knew that they did not, and said representations by plaintiff were made falsely and knowingly by plaintiff with the intent to have defendants rely on said representations, and defendants did so rely."

As a fourth separate defense they alleged, "That plaintiff had a duty to inform defendants that the agreements and guaranty did not comply with the laws of the State of California or the regulations of the Public Utilities Commission of the State of California and that plaintiff failed to carry out said duty and its failure to so inform defendants in accordance with its duty was fraudulent."

The court found, "Plaintiff was guilty of fraud, but [the developer] did not rely upon any false statement in executing [the contract] in that it would have executed an agreement providing for payment at a rate of $2.00 per foot as stated in [the utility's] Tariff Rule 15."

The finding of fraud was predicated upon the negotiations between the parties before and after the execution of the contract. On March 25, 1966, apparently in response to an inquiry from the developer's engineers, the utility wrote them concerning the costs of natural gas and of propane service. The letter included the following: "Based on construction costs experienced during the 1965 season, the developers would, under our Rule 15, be required to make an advance payment of some $29,800 calculating the distance from Hiway 50 to and within the Unit 1 area at $3.35 per foot." The vice-president of the developer testified that the developer relied upon the information furnished to its engineers, and that the developer would not have signed the contract calling for a unit cost of $3.35 per foot if he had known that rule 15 provided for a unit cost of $2 per foot; that the developer did not ascertain that rule 15 contained a provision for a unit price of $2 per foot (cf. fn. 3 above), until it finally received a copy of the rule after a dispute developed concerning the charges billed by the utility. It was acknowledged, however, that the developer would have signed a contract that contained a unit price, $2 per foot or any other, which was actually contained in rule 15.

The utility manager testified that he did not intend to charge the developer in excess of the tariff filed in 1960; that by virtue of construction work performed in the summer of 1965 it had been ascertained that the 1960 rate for gas main extensions was unrealistic; that he did not appreciate that the tariff rate would have to be changed; that he quoted a figure which realistically reflected the utility's cost; and that he did not learn that the utility could only charge $2 per foot until the dispute arose in

1967. He acknowledged that he had a copy of rule 15 in his office when the contract was entered into in September 1966; that in 1965 proceedings had been taken to amend the rule in other particulars; and that proceedings were ultimately taken to increase the rate from $2 to $3.05 per foot.

When the work was completed the utility on April 4, 1967 demanded the sum of $27,189.96 from the developer and its guarantor. This sum represented charges of $35,390.76 less credits for service connections made to that date of $8,200.80. The charges included 9,721 feet of pipe at a rate of $3.35 per foot and indicated that the total cost was "to be amortized as provided under P.U.C. Rule 15 and our agreement." On April 10, 1967 the developer wrote that it wanted clarification of certain discrepancies, which were not related to the price, and requested a copy of "P.U.C. Rule 15." In the utility's reply dated April 14, 1967, after addressing itself to the developer's complaints and giving it credit for one small item, it stated, "Your request for a copy of our Rule 15 indicates the possibility of further discussion between us over its provisions and application, and while you would be welcome at any time to examine it in our office, we feel going in that direction completely missed the point and would be fruitless." On April 21, 1967 the developer repeated its request for a copy of rule 15 and rule 16 relating to service connections. On April 28, 1967 the utility sent copies of the requested rules, explained its interpretation of the provisions of the contract, and demanded payment.

On May 5, 1967 the developer directed the utility's attention to the provisions of the rule specifying a $2 per foot rate. On May 9, 1967 the utility explained that costs had gone up since the rate was specified in 1960 and it insisted on payment according to the rate set forth in the contract. The developer replied, ". . . we agree that we signed a separate agreement wherein the price per foot was stipulated. However, we have been informed by our attorney that this contract or agreement is not valid if the terms specified therein are not in accordance with Rule 15. Therefore, although we recognize that we have an obligation, we do not feel we can pay the amount requested, until the above noted discrepency is cleared up." On June 28, 1967 the utility asquiesced in the $2 rate and rebilled the developer for a net figure of $15,986. When the developer refused to pay this action was commenced. At the hearing it was stipulated that further credits had reduced the principal sum to the amount awarded in the judgment.

Civil Code section 1572 provides: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another

party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] 4. A promise made without any intention of performing it; or, [¶] 5. Any other act fitted to deceive."

If the premise, adopted by the parties and the court, that the legal rate for gas main extensions to a subdivision or a tract was $2 a foot is followed (cf. fn. 3 above), it is apparent that the finding of fraud may be predicated on the assertion through the original estimate and in the contract that the rate provided in rule 15 was $3.35 per foot, when that assertion was not warranted by the information of the person making it, who should have known that the filed and approved rate was $2 per foot. Moreover, the failure to forthrightly furnish a copy of the rule when it was requested and the attempt to collect the full contract price would sustain an inference that there was a violation of subdivisions 1, 2, 3 or 5 of section 1572 at that time. (See *Curran* v. *Helsop* (1953) 115 Cal. App.2d 476, 480-481 [252 P.2d 378].) Even though the utility did not intend to deceive the developer in the precontract negotiations and in the form of the contract itself, the representation that the $3.35 per foot charge was authorized by its lawful tariffs was in fact made to induce the developer to enter into the contract.

Defendants assert that the fraud of the utility is a complete defense to an action on the contract. (See *Friedberg* v. *Weissbuch* (1955) 135 Cal. App.2d 750, 756 [287 P.2d 785]; and 23 Cal.Jur.2d, Fraud and Deceit, § 54, pp. 134-135.) In the case cited the contract was executory on both sides, the defendant had abandoned the premises upon discovery of the fraud, and the court properly held that the plaintiff could not enforce the unexecuted portions of the agreement. Here the defendants received all of the benefits—the extension of the gas mains—for which they contracted and they have not attempted to and cannot physically rescind. The text cited by defendants concludes, "Fraud, when so pleaded [as a defense], may constitute a complete defense to the action; or it may be set up as a partial defense or counterclaim and entitle the defendant to recoupment for the damages sustained. Of course, in order so to recoup, the amount must be definite and ascertainable by calculation, and the defendant must show affirmatively a right of action in his favor arising out of the fraud." (23 Cal.Jur.2d at pp. 134-135, fns. omitted.)

■ "The elements of actual fraud, whether as the basis of the remedy in contract or tort, may be stated as follows: There must be (1) a *false representation* or concealment of a material fact (or, in some cases, an opinion) susceptible of knowledge, (2) made with *knowledge* of its falsity or without sufficient knowledge on the subject to warrant a representation, (3) with the *intent* to induce the person to whom it is made to act upon it; and such person must (4) act in *reliance* upon the representation (5) to his *damage*. [Citations.]" (See 1 Witkin, Summary of Cal. Law (1960) Contracts, § 137, p. 147; and 23 Cal.Jur.2d, *op.cit.,* § 66, pp. 164-165.)

■ The court concluded that the developer did not rely upon the utility's representation that $3.35 per foot was a legal rate because it would have signed a contract at the legal rate of $2 per foot. The fact that the developer might have executed a different contract if it had known the true facts, does not affect its reliance on the misrepresentation in executing a contract for a greater rate. If the question were not whether the rate represented were the legal rate, but whether the sum represented the actual cost and the parties were bargaining, free of regulation, for reimbursement to the utility of its actual costs, it is clear that the fact the developer would be willing to contract for the actual cost would not prevent him from showing that he relied on the accuracy of the representation in agreeing to a larger figure. The fact that the developer was willing to pay the legal rate really goes to the matter of damages.

The court in summing up properly noted that there were no damages resulting from the alleged fraud because the utility was not receiving more than the legal rate. ■ "Fraud without damage furnishes no ground for action, nor is fraud without damage a defense." (*Holton* v. *Noble* (1890) 83 Cal. 7, 9 [23 P. 58]. See also *Bernson* v. *Bowman* (1960) 182 Cal.App.2d 697, 704 [6 Cal.Rptr. 455]; and *Molfino* v. *Levinson Produce Co.* (1947) 79 Cal.App.2d 587, 589 [180 P.2d 365].) Defendants plea that they should be relieved of payment in order to discourage similar attempts to secure overpayment in the manner unsuccessfully attempted by plaintiff, does not give rise to a cause of action in the absence of a showing of actual damage.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.