[Sac. No. 7789.   In Bank.   July 3, 1967.]

DAVID KELLER et al., Plaintiffs and Appellants, v. THORNTON CANNING COMPANY et al., Defendants and Respondents.

Chargin & Briscoe and Ann M. Chargin for Plaintiffs and Appellants.

McCutchen, Doyle, Brown, Trautman & Enersen, Loyd W. McCormick, Craig McAtee and Stephen R. Grant for Defendants and Respondents.

TOBRINER, J.—This case turns on the shippers' contention that because the carrier lacked a required permit from the Public Utilities Commission authorizing its operations as a radial highway common carrier, it could not file suit to recover the minimum rates that it should have charged. Following a trial on special defenses, the court entered judgment for the shippers; the carrier appeals. We have concluded that the policies and provisions of the Highway Carriers Act preclude the shippers' defense to an action to recover the hauling tariff undercharges.

The original carrier involved in this matter was a partnership consisting of LeRoy Hessler, Norman Bosche, and James Kelley; these parties, operating under the name of L.N.J. Trucking Company, held a radial highway common carrier permit from the Public Utilities Commission. In January 1960 LeRoy Hessler and Bosche left the partnership, and David and Henry Keller, together with Roland and Alvin Hessler, became new partners with James Kelley. The organization conducted business under the name of L.N.J. Company. Although the new partnership continued to engage in trucking operations, it failed to secure a transfer of the old partnership's operating permit from the Public Utilities Commission.[1]

---

[1] According to David Keller's testimony at trial the new partnership made application for a transfer in June 1960 but the application lacked the necessary signature of one of the partners.

The L.N.J. Company filed articles of incorporation in November 1960; the Public Utilities Commission in April 1961 authorized the transfer of the permit formerly held by the L.N.J. Trucking Company to the L.N.J. Corporation.

In July 1961 the corporation received a "staff directive" signed by the secretary of the commission. The letter informed the corporation that an examination of transportation records showed that the corporation had been charging its shippers less than the minimum rate set by the commission. The letter instructed the corporation to review its records to determine the amount of the undercharges and to collect such sum from the shippers. Pursuant to the directive plaintiffs David and Henry Keller and Alvin Hessler, successors in interest of the now dissolved corporation, brought this suit to recover undercharges accruing since January 1960 against its shippers, Thornton Canning Company and Thornton Beverage Company.

The shippers interposed the defense that the plaintiffs were barred from recovering the legal minimum rate because the L.N.J. Company and, later, the L.N.J. Corporation, did not carry an appropriate permit at the time the services were performed. At a trial limited to the defenses raised by the shippers the trial court ruled that the carrier lacked the requisite permit and therefore could not recover.

Public Utilities Code section 3571 provides: "No highway contract carrier or radial highway common carrier shall engage in the business of transportation of property for compensation by motor vehicle on any public highway in this State without first having obtained from the commission a permit authorizing such operation." The applicant for a permit must provide the commission with "full information concerning the financial condition and physical properties of the applicant." (Pub. Util. Code, § 3572, subd. (c).) "If the commission finds that the applicant possesses the required financial responsibility to perform the operations proposed, it shall issue a permit." (Pub. Util. Code, § 3572.)[2] The carrier must demonstrate its ability to afford some protection against liability for personal injuries and property damage. (Pub. Util. Code, § 3631.)[3]

---

[2]The commission may, in its judgment, attach conditions to the permit. (Pub. Util. Code, § 3572; see also Pub. Util. Code, § 3631.)

[3]A shipper's reliance on a carrier's permit is thus ordinarily limited to the knowledge that the commission has found the carrier "financially responsible" at the time of issuing the permit and that the carrier pos-

Failure to comply with these regulations subjects the carrier and its officers and employees to criminal prosecution (Pub. Util. Code, § 3801) and civil penalties. (Pub. Util. Code, § 3803.) ■■ The Public Utilities Code does not, however, forbid a carrier lacking a permit from bringing an action against the shipper.[4]

Since the L.N.J. Company did not secure the necessary transfer of the L.N.J. Trucking Company's permit from the Public Utilities Commission (see Pub. Util. Code, § 3574), the issue centers on whether such failure conclusively bars recovery in this action. ■■ Chief Justice Traynor has succinctly stated the applicable considerations: ''[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act. The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of deterring illegal conduct. . . . In some cases, on the other hand, the *statute making the conduct illegal, in providing for a fine or administrative discipline excludes by implication the additional penalty involved in holding the illegal contract unenforceable*; or effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each such case, how the aims of policy can best be achieved depends on *the kind of illegality and the particular facts involved.''* (*Lewis & Queen* v. *N.M. Ball Sons* (1957) 48 Cal.2d 141, 150-151 [308 P.2d 713].) (Italics added.)

At the outset we note that the Highway Carriers Act contains no specific provision that a non-licensed carrier may not bring or maintain an action for the charges legally due to it, and that the Legislature may have, in ''providing for a fine''

sesses some liability insurance. Unlike potential licensees in other occupations the carrier need not demonstrate ability, educational background, good character, or experience in order to obtain a permit.

[4]Compare section 7031 of the Business and Professions Code: ''No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract . . . .''

and "administrative discipline [excluded] by implication the additional penalty involved in holding the illegal contract unenforceable." (*Lewis & Queen* v. *N.M. Ball Sons, supra,* 48 Cal.2d at p. 150.)

As we shall point out, however, our reason for upholding the carrier's right to bring this action rests upon more vital considerations: We look to "the kind of illegality and the particular facts involved." The paramount purpose of the regulation of the carriers is the protection of the public against ruinous carrier competition and such possible attendant evils as improperly maintained equipment, inadequate insurance, and poor service. We shall explain that the Public Utilities Commission, in order to secure these purposes and enforce the statute, has used as a principal sanction the device of requiring the underpaid carrier to sue for the statutory minimum rate. We believe the more important objective of protecting the minimum rate structure, as enforced by the commission, prevails over that of penalizing the unlicensed carrier by foreclosure of access to the courts. Thus the "kind of illegality" involved in the unlawful tariff outweighs the illegality of the lack of the license.

The applicable statutory provisions and the rulings of the commission attest the importance of the elimination of the disruptive undercharge. Thus the Legislature has authorized the Public Utilities Commission to set minimum and maximum rates of compensation for highway carriers. (Pub. Util. Code, § 3662.) "It is unlawful for any highway permit carrier[5] to charge or collect any lesser rate than the minimum rate . . . established by the commission under this article." (Pub. Util. Code, § 3664.) Other pertinent provisions of the Public Utilities Code forbid carriers and shippers to employ rebates or other false and evasive devices in order to avoid the legal rates. (Pub. Util. Code, §§ 3667-3670.)

The Public Utilities Commission has been insistent that the most effective deterrent to the destruction of the policy by undercharging is exaction from the profiting shipper of the legal rate. (See *People* ex rel. *Public Util. Com.* v. *Ryerson* (1966) 241 Cal.App.2d 115, 116 [50 Cal.Rptr. 246] ; *Pratt* v. *Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 140 [39 Cal.Rptr. 332].) As stated in *Gardner* v. *Rich Mfg. Co.*

---

[5] "Highway permit carrier" does not mean a highway carrier who in fact holds a permit; it merely means a highway carrier who need not obtain a certificate of "convenience and necessity." (Pub. Util. Code, §§ 3515, 1063.)

(1945) 68 Cal.App.2d 725, 732 [158 P.2d 23], the " 'pressure of the shippers upon the carriers for reduced rates in violation of the statute will almost entirely be relieved if the shippers know that notwithstanding any illegal bargain that is made, recovery may still be had on the basis of the minimum rates fixed by the commission.' " (Quoting *Johnston* v. *L.B. Hartz Stores, Inc.* (1938) 202 Minn. 132, 135 [277 N.W. 414, 416].)

To hold that the partnership's neglect in obtaining the proper permit could immunize defendant shipper from the legal responsibilities imposed by the statute would undermine the commission's own procedure to deter illegal undercharges. In *Webster H. Tennis* (1964) 63 P.U.C. 665, the commission found that certain of the respondents had been operating as highway carriers *without having secured the required permits* and ordered these respondents to take legal action if necessary to collect undercharges accruing during the period of operation without a permit.

To sustain their position that plaintiffs are barred from suit, defendants rely heavily upon *Orlinoff* v. *Campbell* (1949) 91 Cal.App.2d 382 [205 P.2d 67]. In that case when the shipper refused the carrier's proffered performance of the executory contract of carriage, the carrier sued for damages. The shipper defended upon the ground that the carrier held no permit from the Public Utilities Commission.

The Court of Appeal in *Orlinoff* correctly noted that the Highway Carriers Act "is clearly one for regulation of the industry and not for revenue alone." (P. 385.) After discussing the general purposes of the Highway Carriers Act the court held: "It is settled beyond question that the penalty of nonenforceability of contracts, in addition to those of fine and imprisonment, may be a necessary requirement to accomplish the results intended by the legislation, namely to restrict the regulated business to those who have been duly licensed. . . . The primary purpose of the rule of nonenforceability being the discouragement of practices forbidden by law, no reason exists for declining to apply it to the contracts of unlicensed highway carriers, as it has been consistently applied to the contracts of unlicensed architects, brokers, and others for the rendition of personal services." (P. 388.) Finally, the court concurred in the shipper's contention that if it had continued performance, knowing of the carrier's illegal status, the shipper would thereby have exposed itself to possible civil and criminal penalties. (See Pub. Util. Code, §§ 3802, 3804.)

In the instant case, however, we do not deal with an action for damages for breach of an unexecuted contract but with an action for collection of undercharges of a performed contract. The present suit contemplates the achievement of the policy of the act by preventing and penalizing illegal charges below the minimum rates. *Orlinoff* properly emphasizes the need for "discouragement of practices forbidden by law." (P. 388.) Here, authorization of the carrier's action will tend to accomplish that discouragement.

We believe that the policy expressed in the Highway Carriers Act, as well as the commission's methods of enforcing that policy, supports the conclusion that the non-licensed carrier enjoy access to the courts to collect the amount of undercharges. Although such access does absolve the carrier to some extent from its failure to secure a license, other penalties will serve to deter such nonfeasance.[6] ▮▮▮ On the other hand, to fasten upon the failure of the carrier to obtain the permit as a bar to recovery is to make secure the shipper's illegal profit, and thereby to condone and encourage the payment of illegal haulage rates.

In the light of the statutory objectives, the preservation of the rate structure is more essential than the exclusion of the non-licensed carrier from the courtroom. One of the main reasons for the licensing system itself is the protection of the public from the illegitimate carrier. To decree that the lack of a license prevents the collection of the minimum rate would be to give preference to a means of executing a lesser statutory purpose over a mechanism for enforcing its principal purpose. Our implementation of the higher legislative policy will serve to frustrate shipper and unlicensed carrier alike from devising with impunity schemes evasive of the minimum rate structure.

The judgment is reversed.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Burke, J. and Sullivan, J., concurred.

---

[6]Since the carrier operated under the jurisdiction of the Public Utilities Commission, it remains subject to the penalties provided by the code; the carrier and its officers and employees face criminal penalties and fines of up to $500 for each day of operation without the proper permit. (Pub. Util. Code, §§ 3801, 3803, 3805.)