[No. H002385. Sixth Dist. Dec. 14, 1988.]

SOUTH BAY TRANSPORTATION COMPANY, Plaintiff and Appellant, v.
GORDON SAND COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 2.

COUNSEL

Ara Shirinian for Plaintiff and Appellant.

Michael S. Rubin and Walsh, Donovan, Lindh & Keech for Defendant and Appellant.

OPINION

AGLIANO, P. J.—

1. *Introduction*

Under the Highway Carriers' Act, a permit from the Public Utilities Commission is required to engage in the business of transporting property on the highways in dump trucks and certain other types of vehicles. (§§ 3501, 3517, 3541, 3611; unspecified section references are to the Pub. Util. Code.) Such highway carriers are required to charge no less and no more than minimum and maximum rates established by the rules of the Public Utilities Commission unless the commission approves a deviation. (§§ 3662, 3664, 3665, 3667.) ■ "The paramount purpose of the regulation of the carriers is the protection of the public against ruinous carrier competition and such possible attendant evils as improperly maintained equipment, inadequate insurance, and poor service." (*Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 967 [59 Cal.Rptr. 836, 429 P.2d 156]; cf. § 3661.) ■ "[A] carrier has both the right and the duty to recover undercharges; recovery is essential to preserve the minimum rate structure for a vital quasi-public industry and to maintain the integrity of the orders of the Public Utilities Commission [citations]." (*West* v. *Holstrom* (1968) 261 Cal.App.2d 89, 92 [67 Cal.Rptr. 831].)

After a court trial, plaintiff South Bay Transportation Company, a licensed dump truck carrier (carrier), recovered $33,561.37 by which it had undercharged defendant Gordon Sand Company (shipper) for transporting bulk sand. Shipper appeals from this judgment on the following grounds: its motion for continuance of trial should have been granted; it was entitled to prevail because carrier had misled it about the true cost of carrier's services; public policy does not require further payments by shipper; and the amount of the judgment should be reduced because carrier has saved expenses and because the wrong rates were applied to some shipments. We affirm the judgment.

Carrier cross-appeals from the denial of its posttrial motion for attorney fees. We reverse this order.

Before reviewing the trial evidence, we consider whether a continuance of the trial should have been granted.

## 2. *Motion for Continuance**

. . . . . . . . . . . . . . . . . . . . . . . . . .

## 3. *Substantiality of Evidence*

Shipper attempted to defeat or limit carrier's recovery of undercharges and to place liability on carrier by cross-complaint on the grounds that (1) carrier had tricked shipper into a contract for shipping sand by misrepresenting the legality of the agreed rates and (2) the agreed rates would have been legal for a number of shipments if carrier had provided enough trucks and completed the necessary paperwork. Shipper now contends the trial court's adverse factual findings are not supported by substantial evidence.

### A. *Trial Court Findings*

The trial court made the following findings on these factual issues. The rates applicable to shipping bulk sand by truck are those contained in the Public Utility Commission's minimum rate tariff (MRT) 7-A. "Under the provisions of MRT 7-A, the carrier and the shipper can take advantage of an alternative rail rate, that is, a rate different from that required by MRT 7-A if certain conditions are met . . . . An additional prerequisite is that there must be issued by the shipper or carrier what is called a 'multiple lot document' . . . . If neither of these conditions is met, each shipment must be rated under MRT 7-A . . . . There was no substantial evidence presented demonstrating that these conditions were met.

"The [shipper's] contention that it was the victim of a deal perpetrated by the [carrier] on an innocent [shipper] is not supported by the evidence under the preponderance test. [¶] As pointed out in [carrier's] closing brief . . . , Mr. Gordon has exercised managerial duties with the [shipper] for some 14 years . . . . For a period of at least 8 years prior to the retention of [carrier], he has handled the business of transportation of sand in behalf of his company under complex rail tariffs . . . . [¶] Transportation costs are a

---

* See footnote, *ante,* page 650.

very important element in the conduct of [shipper's] business, and to be the success it has been in this business, the [shipper] had to be aware of these costs . . . . The [shipper's] position is that it was not aware of the complicated provisions of the PUC's freight tariffs. . . . [¶] Mr. Gordon knew . . . a recognized rail tariff expert . . . since the mid-70's and has consulted with him at least once prior to the retention of [carrier].

"Of importance is the testimony of Mr. Mallen (President of [carrier]) . . . . He testified that he told Mr. Gordon that the rates the [carrier] charged the [shipper] were illegal . . . . [¶] Of further interest is Exhibit 6, a letter which was admitted into evidence . . . which Mr. Gordon admitted seeing about February 17, 1981 . . . which was around the time of the so-called deal between the parties . . . . The letter raised the question whether the rates charged by the [carrier] were illegal. Such evidence is important on the issue of the credibility of Mr. Gordon's testimony that he did not know the rates charged by the [carrier] were not lawful under the PUC regulations.

"Of further interest in this case is Exhibit C which is an application by the [carrier] to prospectively legitimize the rates it had previously charged the [shipper]. In support of that application and attached to that application . . . is a statement dated May 5, 1981 signed by Mr. Gordon, President of the [shipper], setting forth that the [shipper] intended to use the applicant's services under the proposed rates if the authority is granted.

"The reasonable interpretation of the fact of the application . . . and the attached supporting statement of Mr. Gordon is that Mr. Gordon was aware of the fact that the rates charged by [sic] the [shipper] by the [carrier] were below the authorized PUC rates. [¶] From the evidence, it is evident that the [shipper] was using [carrier's] services at those rates some five months prior to that letter."

## B. *Standard of Review*

■ The standard of review is: " '[A]ll factual matters will be viewed most favorably to the prevailing party . . . and in support of the judgment [citation].' (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 . . . .) ' "In brief, the appellate court ordinarily looks only at the evidence supporting the successful party, and disregards the contrary showing." . . . All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]' (*Id.,* at pp. 925-926 . . . .) ' "[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [court]. When two or more inferences can be reasonably deduced

from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. . . .'" ' (*Florez* v. *Groom Development Co.* (1959) 53 Cal.2d 347, 354 . . . .)" (*Santa Clara County Environmental Health Assn.* v. *County of Santa Clara* (1985) 173 Cal.App.3d 74, 81 [218 Cal.Rptr. 678], italics omitted.)

■ On the other hand, " 'Substantial' means evidence 'of ponderable legal significance. Obviously the words cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citations.]" (*Claussen* v. *First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 436 [230 Cal.Rptr. 749].)

## C. *Trial Evidence*

The presidents of shipper and carrier reached a general oral agreement at a meeting in late 1980 or early 1981 that carrier would deliver bulk sand from Lapis in Monterey County, California to shipper's headquarters in Compton, California, at a charge of $15 per ton and directly to shipper's customers in Los Angeles County at a charge of $18 per ton. As was customary in shipper's business, the agreement was not reduced to writing.

Shipper had learned from a rail rate expert that, in January 1981, it could have shipped the sand between Lapis and Compton by rail for $14.50 per ton. Shipper's president testified he preferred trucking over rail because "in the case of the sales to the end user it would be more efficient to ship by truck directly from the Lapis plant right on through to the end users without making an intermediate stop."

Carrier hauled sand under this agreement from January 15 to August 14, 1981, when shipments ceased by mutual agreement. In March, shipper agreed to carrier's request for a retroactive increase in the base rate to $15.50 per ton. After a continuing dispute about the amount shipper owed, carrier filed this lawsuit.

■ Shipper contends the trial court unreasonably viewed the evidence bearing on whether shipper's president was aware that the agreed trucking rates were illegally low. Shipper argues that the trial court should have believed the following testimony of its president. He was continually assured by carrier's president and vice-president that carrier could lawfully charge trucking rates near railroad rates so long as the carrier was moving 50 tons or more a day. He would not have entered a contract knowing it was illegal. In February 1981, carrier's president convinced him to disregard the letter to carrier from a former sand supplier asserting their agreed

rates violated the Public Utilities Commission's minimum rate tariff 7-A. In May 1981, shipper's president signed support for an application by carrier to the Public Utilities Commission for a deviation from minimum rates to $15.50 per ton between Lapis and Compton simply in order to help out carrier and not to legitimize an illegally low rate.

 Uncontradicted testimony should not be arbitrarily rejected by the fact finder, but it may be self-impeaching and warrant disbelief for a number of reasons, such as inherent improbability, obvious bias, vagueness, or inappropriate certainty. (*Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147]; *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 477 [58 Cal.Rptr. 249, 426 P.2d 753]; *Camp* v. *Ortega* (1962) 209 Cal.App.2d 275, 282-284 [25 Cal.Rptr. 873], and cases there cited; cf. *Blankman* v. *Vallejo* (1860) 15 Cal. 638, 645; *Hicks* v. *Reis* (1943) 21 Cal.2d 654, 659-660 [134 P.2d 788]; *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 890 [92 Cal.Rptr. 162, 479 P.2d 362].) Even assuming, as shipper contends, its president's testimony was uncontradicted on several points, the trial court detailed several good reasons in its thorough findings, which we need not repeat, for disbelieving crucial aspects of his testimony.

Moreover, as shipper recognizes, its president's testimony was directly contradicted in part by the testimony of carrier's president and indirectly impeached by inferences available from documentary evidence. Shipper errs, for example, in claiming there was no dispute about why it supported carrier's application for a rate deviation. Carrier's president testified they intended both to facilitate carrier's northbound hauling and to obtain approval of the southbound rate already agreed to by shipper.

At most, shipper establishes that there was some evidence in support of its factual contentions. This falls short of demonstrating the trial court drew unreasonable inferences and improperly resolved evidentiary conflicts. There was substantial evidence supporting the conclusion that shipper was aware the agreed shipping rates were below minimums established by the Public Utilities Commission. (Cf. *West* v. *Holstrom, supra,* 261 Cal.App.2d 89, 93.)[1]

 An underpinning for several of shipper's arguments is that it is undisputed carrier agreed to haul 50 or more tons of sand a day for shipper, thereby meeting a tariff condition allowing carrier to charge lower rates

---

[1] Moreover, it is questionable whether a different result would follow a conclusion that shipper was duped about the applicable rates. As explained in part 4 below, public policy requires enforcement of the carrier's claim regardless of the carrier's blameworthiness. (Cf. *Keller* v. *Thornton Canning Co., supra,* 66 Cal.2d 963, 966-967.)

based on railroad rates. In fact, carrier did pick up 50 or more tons on 45 of the 100 days it hauled sand for shipper.

Carrier's president testified: there was no agreement to ship 50 tons or more daily in order to qualify for a "rail-alternative" rate; he only promised shipper that carrier would try to locate enough equipment to deliver 50 to 75 tons a day; shipper usually wanted 50 tons a day, but not always; he could not recall any complaint among those made by shipper about carrier's failure to pick up 50 tons.

Shipper's president testified: the parties ultimately agreed in middle or late February to ship 75 tons a day; they agreed first to transport several test shipments to see how it worked out; he did not expect carrier to deliver 75 tons a day right away; initially carrier was going to deliver three days a week; shipper complained several times because carrier was not delivering 50 tons a day.

Thus, there was a conflict in the evidence about when, if ever, carrier agreed to haul 50 tons daily. While the trial court made no express finding resolving this conflict, shipper did not request such a finding. Thus, we presume the trial court implicitly rejected shipper's contention that the parties agreed to ship sufficient amounts to qualify for rail-based rates. (*Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 861 [137 Cal.Rptr. 528].) Substantial evidence supports this implicit finding.

### 4. *Policy Regarding Recovery of Undercharges*

■ Shipper argues that public policy will not be served by requiring it to pay the established minimum shipping rates. Shipper points out that, unlike some undercharge lawsuits (e.g., *Keller* v. *Thornton Canning Co., supra,* 66 Cal.2d 963, 965), this lawsuit was not instigated by the Public Utilities Commission. Shipper insists that a recovery of undercharges by carrier will benefit only carrier and not the public. Similar contentions have been repeatedly rejected. Carriers have been allowed to sue shippers for undercharges to discourage shippers from colluding with carriers and pressuring them for illegally low rates. (*Butler* v. *Bell Oil & Refining Co.* (1945) 70 Cal.App.2d 728, 730-731 [161 P.2d 559]; *West* v. *Holstrom, supra,* 261 Cal.App.2d 89, 92-93.)

Shipper suggests carrier should be denied recovery in order to punish it for agreeing to illegal rates. The Supreme Court determined in *Keller* v. *Thornton Canning Co., supra,* 66 Cal.2d 963, that public policy is best served by the courts leaving punishment of the carrier (there undercharging and operating without a permit) to the Public Utilities Commission and

enforcing the minimum rate structure against shippers who have attempted to avoid it. (*Id*. at p. 969, and fn. 6.)

Shipper makes another policy argument based on MRT 7-A. Observing that the tariff requires a principal carrier to pay a subhauling independent contractor at least 80 to 95 percent of the minimum rates charged, shipper complains that carrier should not be allowed to pocket this part of the undercharges. Shipper contends there is no statutory requirement that carrier pass on this element of its recovery to the subhaulers it employed to fulfill its agreement with shipper.

We note there is no basis in the evidence for assuming that carrier will not pass on the proper payments to its subhaulers. Carrier's president testified he did pay the subhaulers the proper percentage of the charges already collected. The trial court sustained carrier's relevance objections when shipper tried to ascertain whether carrier intended to pass on a percentage of any recovery. Shipper does not attempt to demonstrate this evidence ruling was erroneous.

We will not allow shipper to avoid its liability for the full amount of the minimum rates because carrier happened to hire independent contractors. Shipper is not entitled to take advantage of tariff provisions apparently intended to benefit independent subhaulers.

5. *Multiple Lot Shipments*

Shipper contends that either carrier's recovery should be reduced or carrier should be liable to shipper for those charges which could have been lowered if carrier had fulfilled a promise to deliver a minimum of 50 tons daily. As explained above, transportation of such quantities of sand would allow carrier to charge based on railroad shipping rates.

Item 240 of MRT 7-A provides for memorializing agreements to aggregate shipments made in a single day in order to obtain rail rates. As paraphrased in the trial court's findings, Item 240 provides that "each . . . pickup shall be rated as a separate shipment" unless (1) the entire shipment is available at the time of the first of several same-day pickups and (2) the proper documents are prepared. The carrier "shall issue to the shipper a single multiple lot document for the entire shipment" when the carrier, before the first pickup, knows the names of consignor and consignee, points of origin and destination, date of first pickup, and the kind and quantity of property to be shipped. If the carrier does not have this information in time, the shipper may, within 10 days of the first pickup, either prepare the

multiple lot document itself or cause the carrier to prepare it by confirming the oral multiple lot shipping instructions in writing.

Based on these tariff provisions, shipper complains that carrier should not be allowed to profit by breaching obligations (1) to coordinate pickups so that 50 tons would have been shipped on more than 45 days and (2) to prepare multiple lot documents. (Compare *Kentner Truck Line* v. *Maier Brewing Co.* (1960) 183 Cal.App.2d 89, 93 [6 Cal.Rptr. 572].) This argument assumes there was an agreement to ship 50 tons daily to qualify for rail rates. We observe that had there been such an agreement, shipper could have remedied carrier's allegedly deficient documentation by itself preparing the appropriate documents pursuant to Item 240. There was no evidence that shipper did so, and, as carrier points out, the trial court implicitly found there was no such agreement.

No obligation to prepare multiple lot documents arises absent an agreement to make daily multiple shipments at railroad-based shipping rates. There is nothing in MRT 7-A which requires the carrier to use such rates simply because shipments happen to meet the railroad's minimum weight requirements. Absent an agreement to ship in multiple lots, carrier cannot be faulted for not preparing multiple lot documents even on those days when over 50 tons were shipped. Since there was no agreement to aggregate shipments, we need not evaluate shipper's contention that the invoices accompanying each shipment constitute substantial compliance with the multiple lot document requirements. (*Inland Cities Express, Inc.* v. *Diamond Nat. Corp.* (9th Cir. 1975) 524 F.2d 753, 756.)

In short, shipper's arguments concerning the applicability of rail-based rates rest on a factual premise implicitly rejected by the trial court.

6. *Attorney Fees*

■ Carrier contends the trial court erred in denying its posttrial motion for attorney fees pursuant to Civil Code section 1717. The motion was based on a provision in the invoices or bills of lading from carrier signed by shipper for recovery of attorney fees involved in effecting payment. Signed bills of lading, like the sample in evidence, can add terms to a carrier's contract. (Civ. Code, § 2176.) Shipper opposed the motion, arguing carrier's recovery of undercharges was based on regulatory tariffs and not "on" any contract.

The nature of an action for undercharges has been considered in cases concerning the applicable statute of limitations. The courts have found applicable the limitations periods for breach of contract, rather than for

statutory liability, reasoning, "While the minimum hauling rates to be charged . . . are fixed by law, and any charge less than the established rate is 'unlawful' (Highway Carriers' Act, § 10; now Pub. Util. Code, § 3664), the law does not create the liability. Rather the law only determines the amount of the liability created by the agreement of the parties. The prescribed rate provisions and regulations are deemed a part of every such contract, and the parties are deemed to have contracted with such provisions in mind, for otherwise the state's rate-making policy expressed in the Highway Carriers' Act would not be effectual. [Citation.] But the substantive right of action stems from the performance of services pursuant to the contractual agreement of the parties." (*Gardner* v. *Basich Bros. Construction Co.* (1955) 44 Cal.2d 191, 194 [281 P.2d 521]; cf. *Church* v. *Public Utilities Com.* (1958) 51 Cal.2d 399, 401 [333 P.2d 321]; *Pellandini* v. *Pacific Limestone Products, Inc.* (1966) 245 Cal.App.2d 774, 779 [54 Cal.Rptr. 290].) The 1970 enactment of a three-year limitations period in Public Utilities Code section 3671 does not affect the reasoning of this precedent.

We are persuaded by this precedent that an undercharge action is essentially on the contract between the parties, although the charges are dictated by regulatory tariff rather than the parties' agreement. (Accord *Sea-Land Service, Inc.* v. *Murrey & Son's Co. Inc.* (9th Cir. 1987) 824 F.2d 740, 744-745.)

Shipper also contends, "Since a contract with an illegal end is itself unenforceable, its attorneys' fee provision, like the others in the contract, never 'matures' into an enforceable right and fees may not be awarded under it." While *Geffen* v. *Moss* (1975) 53 Cal.App.3d 215, 227 [125 Cal.Rptr. 687, 79 A.L.R.3d 1232], so holds, it precluded recovery of attorney fees under a contract public policy rendered unenforceable. In contrast, as we have determined above, here the contract (though not its illegal terms) was enforced.

The trial court erred in denying carrier attorney fees pursuant to Civil Code section 1717.

## 7. *Disposition*

The judgment awarding recovery to carrier is affirmed. The order denying carrier attorney fees is reversed for further proceedings which should

also consider fees on appeal. Carrier to recover costs on appeal.

Brauer, J., and Capaccioli, J., concurred.