[No. F012969. Fifth Dist. Apr. 22, 1991.]

JOHN ATAIDE, Plaintiff, Cross-defendant and Respondent, v. HAMILTON COPPER & STEEL CORPORATION, Defendant, Cross-complainant and Appellant.

COUNSEL

Russell, Hancock & Jeffries and Robert W. Hancock for Defendant, Cross-complainant and Appellant.

Fletcher & Fogderude and Eric K. Fogderude for Plaintiff, Cross-defendant and Respondent.

OPINION

BEST, P. J.—

### STATEMENT OF THE CASE

Plaintiff John Ataide, doing business as Ataide Trucking Company (Ataide), brought suit against defendant, Hamilton Copper & Steel Corporation (Hamilton), to recover undercharges for trucking services it provided to Hamilton. These undercharges were the difference between the amount Hamilton paid Ataide and the amount which Hamilton should have paid in accordance with the applicable tariff. Ataide had been ordered by the Public

Utilities Commission (Commission) to "take all reasonable steps including legal action to collect any and all undercharges that may be due."

The trial court concluded that the hauls in question required shipping rates based on transition tariff 2 (T.T.-2) and that the amounts charged for these hauls were lower than the T.T.-2 rate by $48,732.91. Adding interest, the court awarded Ataide $63,699.88. The court further found that, as a result of these low shipping rates, Hamilton acquired an economic advantage over its competitors. The court also concluded that Ataide would not incur a windfall as a result of recovering the undercharges because Ataide was lawfully entitled to these amounts.

## STATEMENT OF FACTS

Hamilton distributed copper and steel pipe. Before August 1, 1984, Hamilton used a transportation broker to arrange for shipment of its products. A company which was owned by John Ataide and his partner, G & A Trucking, was one of the haulers referred by the broker. On August 1, 1984, Hamilton entered into a written contract with G & A Trucking engaging G & A directly to transport its products.

In December 1984, G & A Trucking dissolved. Ataide acquired a truck from G & A and formed Ataide Trucking Company. The Commission issued a highway contract carrier permit to Ataide on April 1, 1985.

Ataide continued to haul for Hamilton. However, a written contract was never entered into. Rather, for each haul, Hamilton warehouse manager, Max Sagraves, would write the amount of the freight charges on the bill of lading. After the shipment was delivered, Ataide's wife, Geri Ataide, would prepare and send the freight bill to Hamilton showing those charges. Before establishing this procedure, Sagraves told Geri Ataide that "their rates were in a guideline by PUC Transition Tariff 2." Although Ataide had a copy of T.T.-2, Mrs. Ataide never compared the rates inserted by Sagraves on the bills of lading with the T.T.-2 rates.

In August 1985, a Commission representative audited some of Ataide's freight bills. In May 1986, the Commission issued an undercharge citation to Ataide for charging less than the applicable tariff rates. Ataide elected not to contest the citation and agreed to pay a fine of $8,837.25.

Following Ataide's receipt of the undercharge citation, Geri Ataide recomputed the freight bills for services performed for Hamilton applying T.T.-2 rates and submitted a bill to Hamilton in the amount of $40,473.42.

In July or August 1986, Ataide decided to close his trucking business because it was not profitable and let his highway contract carrier permit lapse.

## DISCUSSION

I. *Whether the trial court erred in holding that T.T.-2 rates applied to the hauls in question.*

 Under the Highway Carriers' Act, a permit from the Commission is required to engage in the business of transporting property on the highways by means of a motor vehicle. (*South Bay Transportation Co.* v. *Gordon Sand Co.* (1988) 206 Cal.App.3d 650, 653 [253 Cal.Rpt. 753].) "Such highway carriers are required to charge no less and no more than minimum and maximum rates established by the rules of the Public Utilities Commission unless the commission approves a deviation." (*Ibid.*)

At the time Ataide performed the services at issue, Public Utilities Commission general order 147 (G.O. 147) was in effect. With respect to contract carriers such as Ataide, G.O. 147, rule 7 provided in part:

"B. No contract carrier shall commence to perform any transportation or accessorial service until it has on file and in effect with the Commission three copies of an executed binding contract for such service.

"C. No contract carrier shall provide any transportation or accessorial service except in accordance with its contract or contracts as filed and in effect with the Commission. Contract carriers shall strictly observe, as their exact rates, the rates and provisions of their contracts."

With respect to receiving approval of a rate deviation, G.O. 147, rule 9 provided in part:

"B. Contract Carrier Rate Justification

"1. Any contract carrier rate reduction which results in rates below the transition tariff, or its governing publications, must be accompanied by a statement of justification with each copy of the contract filing. The justification shall consist of:

"(a) Reference to the rate of a competing highway carrier, including the identity of the tariff and item number or contract containing the rate being met, or

"(b) Operational and cost data showing that the proposed rate will contribute to carrier profitability. . . ."

■ G.O. 147 did not direct what transportation rates to apply when a contract carrier failed to file a contract with the Commission.[1] However, in a situation analogous to the one here, the Commission held that where no contract exists which has been executed by a carrier and shipper and approved by the Commission for transportation covered by T.T.-2, the T.T.-2 rates are applicable and are, in effect, the minimum rates. (*California American Trucking, Inc.* (1984) 14 Cal.P.U.C.2d 374.) The trial court's ruling is in accord with this decision.

Hamilton contends the trial court's ruling is erroneous based on the later Commission decision in *Robert L. Qualls* (1989) Cal.P.U.C. Dec. No. 89-01-006. Qualls, a highway contract carrier, transported steel in 1986 without a contract. This is similar to the facts in this case. However, unlike here, Qualls presented evidence through a transportation consultant of the iron and steel tariff filed by a common carrier, Conti Trucking, for transportation of steel between the same points. These rates were lower than the T.T.-2 rates. Under these circumstances, the Commission used the lower tariff rates in computing the undercharges. The Commission based its decision on Public Utilities Code section 3663 which provides:

"In the event the commission establishes minimum rates for transportation services by highway permit carriers, the rates shall not exceed the current rates of common carriers by land subject to Part 1 (commencing with Section 201) of Division 1 for the transportation of the same kind of property between the same points, . . ."

The Commission stated in *Qualls* that it would not apply its holding in *California American Trucking, Inc.*, *supra*, 14 Cal.P.U.C.2d 374, in that case. However, contrary to Hamilton's conclusion, *Qualls* did not reverse the Commission's position articulated in *California American Trucking, Inc.* The *Qualls* decision states as one of its conclusions of law that "the transition tariffs are, in effect, minimum rates." This was the position taken by the Commission in *California American Trucking*. What distinguishes *Qualls* from *California American Trucking* is that *Qualls* took into account evidence of common carrier rates in calculating the minimum rates a contract carrier is required to charge in the absence of a contract. This method

---

[1] General order 147-A, effective March 1, 1987, corrected this deficiency by adding rule 13 which provides: "The lowest generally applicable common carrier rate is hereby established as a just and reasonable charge the carrier is required to assess when the transportation of property is provided in absence of a schedule of filed tariff rates, charges, classification, or contract on file in compliance with this General Order."

parallels the rate reduction justification provisions in G.O. 147. As noted above, under G.O. 147 a contract carrier may receive approval of a rate below the transition tariff by providing a reference to a competing carrier's rate. This is essentially what the Commission permitted Qualls to do.

Here, Hamilton did not present any substantial evidence of other carriers' approved rates. James Harris, the executive vice-president of Hamilton, testified that Hamilton was paying similar rates to other carriers at the time in question. However, he also testified that Hamilton did not have either written contracts with those carriers or any kind of documentation from the Commission regarding those rates. Although this testimony was uncontradicted, uncontradicted testimony can be disregarded if it is vague or uncertain. (*South Bay Transportation Co.* v. *Gordon Sand Co.*, *supra*, 206 Cal.App.3d 650, 657.) Since this testimony alone did not demonstrate that the rates Hamilton paid were in accordance with either filed tariff rates or filed contract rates, the court properly rejected it. Thus, in the absence of evidence of the rates of common carriers applicable to the property and location, the court did not err in applying T.T.-2 rates as the minimum rates.

Hamilton also contends the court erred in denying its request to present further evidence on the applicable rates. This request was made orally at the hearing on the objections to the proposed statement of decision. Hamilton was in effect moving for a new trial. (Code Civ. Proc., § 656.) However, Hamilton never filed a written notice of intention to move for a new trial as required by Code of Civil Procedure section 659. Thus, the trial court did not err in refusing to take further evidence.

II. *Whether permitting Ataide recovery in excess of the Commission fine permits it to benefit from its own illegal conduct in contravention of the established policy of the law.*

■ Relying on the general policy that a person cannot take advantage of his own wrong (Civ. Code, § 3517), Hamilton contends it is improper to permit Ataide to recover any amount in excess of the Commission fine because Ataide was in violation of the Commission regulations when it failed to file a contract. However, in a situation such as the one here, a carrier has both the right and the duty to recover undercharges. (*West* v. *Holstrom* (1968) 261 Cal.App.2d 89, 92 [67 Cal.Rptr. 831].) The carrier who fails to comply with the law and Commission regulations is not penalized by foreclosure of access to the courts. (*Keller* v. *Thornton Canning Co.* (1967) 66 Cal.2d 963, 967 [59 Cal.Rptr. 836, 429 P.2d 156].) Rather, public policy is best served by the courts leaving punishment of the carrier to the Commission and by enforcing the minimum rate structure against shippers

who have attempted to avoid it. (*South Bay Transportation Co.* v. *Gordon Sand Co., supra,* 206 Cal.App.3d 650, 658-659.) The fact that Ataide has ceased operations does not affect its right to collect undercharges. (Cf. *West* v. *Holstrom, supra,* 261 Cal.App.2d 89.) Thus, Ataide's agreement to charge illegal rates does not preclude its recovery.

In *Keller,* the California Supreme Court set forth the policy considerations upon which the carrier's right to bring an action to collect undercharges rests. "The paramount purpose of the regulation of the carriers is the protection of the public against ruinous carrier competition and such possible attendant evils as improperly maintained equipment, inadequate insurance, and poor service." (*Keller* v. *Thornton Canning Co., supra,* 66 Cal.2d at p. 967.) It has been further noted that "the collection of undercharges is one of the most effective means of preserving the minimum rate schedule and of eliminating collusion between carriers and shippers [citation]." (*West* v. *Holstrom, supra,* 261 Cal.App.2d 89, 92.)

■ Relying on *In the Matter of the Regulation of General Freight Transportation by Truck* (1990) 35 Cal.P.U.C.2d 307, Hamilton argues the policy concerns discussed above are no longer applicable. In this decision, the Commission stated at page 355:

"Our policy is to establish a regulatory program which ensures that carriers provide the public with competitive and nondiscriminatory rates, good service, and safe drivers and equipment. As explained above, we believe that the best way to implement this policy is through flexible rate regulation and stronger noneconomic regulation. Where regulation is not needed to achieve this policy, none will be provided."

■ With respect to contract carriers such as Ataide, the Commission's adopted regulatory program does not include either maximum or minimum rates. However, contract carriers that do not have common carrier authority can only enter into "special contracts." Special contracts are for services that are not normally provided under common carrier tariffs by any carrier, or which provide for a special relationship between the carrier and shipper. These contracts must be filed with the Commission, and a carrier delivering services without a valid contract is in violation of the general orders and subject to regular enforcement actions. Similarly, with respect to common carriers, this program permits those carriers to individually set rates. However, the tariffs must be filed and must fall within a "zone of reasonableness." ■ Thus, although the Commission is adopting a more flexible approach to tariffs, transportation services are still highly regulated. The Commission remains concerned with ensuring the public is provided with competitive rates, properly maintained equipment, and good service.

Contrary to Hamilton's position, the Commission's adoption of a more flexible approach to setting rates does not require that it take a similar approach with regard to enforcement of Commission regulations. Interpreting the policy changes as requiring this result would make it difficult for the Commission to maintain the integrity of its orders. If regulation is to remain effective, the Commission must have the ability to compel compliance. Thus, the enforcement rationale set forth in *South Bay Transportation Co.* v. *Gordon Sand Co.*, *supra*, 206 Cal.App.3d 650, remains viable. Under the established case law, Ataide may recover the undercharges based on T.T.-2 rates.

III. *Whether the trial court erred in finding Hamilton acquired an economic advantage over its competitors.*

Hamilton also contends the court erroneously concluded Hamilton acquired an economic advantage over its competitors as a result of the rates it paid Ataide. Hamilton argues there is no evidence to support this finding. However, Hamilton does not explain the relevance of this determination. Such a finding is not a prerequisite to the collection of undercharges from the shipper.

Further, this conclusion naturally follows from the trial court's determination that T.T.-2 rates were applicable. Since, based on the evidence presented, the court did not err in applying the T.T.-2 rates, it also did not err in making this additional finding.

### DISPOSITION

The judgment is affirmed with costs to respondent.

Stone, (W. A.), J., and Buckley, J., concurred.